HILLS v. BLAIR.

1. MASTER AND SERVANT—INDUSTRIAL ACCIDENT BOARD—DEATH—WORKMEN'S COMPENSATION LAW.

Where a section hand was killed while he was returning home at noon for dinner, being struck by a passing train, the burden rested on his representatives to show, in proceedings before the accident board, that death resulted from an accident arising out of and in the course of his employment.

2. SAME—APPEAL AND ERROR—CERTIORARI TO INDUSTRIAL ACCIDENT BOARD.

Findings of the industrial accident board which are supported by facts or inferences from the testimony must be taken as true on certiorari.

3. SAME—EMPLOYMENT—DINNER HOUR.

Accidents to employees in the act of going to or from their work are not usually regarded as arising out of the employment or in the course thereof.

4. SAME—RAILROADS.

The fact that decedent was still on the premises of his master, at a considerable distance from the place at which his work was done, did not bring him within the ex-

ception to the rule which has been recognized in certain cases when the servant was so near the place of his employment as in effect to be within the protection of the law.

Certiorari to the industrial accident board. Submitted June 22, 1914. (Docket No. 53.) Decided July 24, 1914.

Leone H. Hills applied for an award of compensation for the injury and death of her husband, Irwin E. Hills, an employee of Frank W. Blair and others as receivers of the Pere Marquette Railroad Company. From the award granted, defendants bring certiorari. Reversed.

*O. C. Trask* (*McArthur & Dunnebacke,* of counsel), for applicant.

*Parker, Shields & Brown* (*S. L. Merriam* and *J. C. Bills,* of counsel), for respondents.

STEERE, J. This is an appeal by respondents, as receivers of the Pere Marquette Railroad Company, from an award of compensation made by the Michigan industrial accident board for the accidental death of Irwin Hills, at Williamston, Mich., on November 16, 1912, while he was an employee of said railway, as a section hand. The facts in the case as testified to by witnesses are practically undisputed. The controversy is over inferences which may be drawn from the facts proven, and conclusions of law thereon.

On the day in question Hills was working during the forenoon at his regular employment in a section crew along respondent's railway track east of Williamston. The crew returned to Williamston with their hand car and stopped for dinner at the hand car house by the south side of the track shortly after 11 o'clock, standard time, putting the car inside preparatory to taking their meal. As they were return-

ing, the smoke of a train coming from the east was seen in the distance. It was customary for the men to carry their dinners with them and eat together at or near where they were at work; but on this day deceased had not waited in the morning for his dinner to be put up by his wife, and hurried away to his work, saying that if he could get excused he would be home to dinner. After the men had put the hand car into the car house and the others were proceeding to eat their noonday meal, Hills took his coat and told the foreman that he was going home for his dinner, to which the foreman assented, and he hurried away. Just as he left the car house, the foreman, when reaching for his dinner pail, noticed a freight train coming from the east "about four or five pole lengths from the car house," meaning the distance between telegraph poles, and told Hills to look out for it. Answering that he would be all right, Hills hurried down the railway track in a westerly direction towards the station. The car house at which the section men ate their dinner was located 1,934 feet east of the station, while Hills' home was about half a block north of it; 225 feet west of the car house a street crossed the railway tracks intersecting a wagon road which ran east and west, parallel with the railroad and just to the north of it. One of the section hands saw Hills go west on the track as far as the street crossing. He could have left the railroad at that point by the public street and gone home along the wagon road on the same side of the railroad as his home. This road, however, though open to the public, was not in good condition for travel. The men employed in the yards were accustomed to enter and leave at the station, going to the car house and elsewhere along the tracks as they found it most convenient. There was also a footpath along the railroad right of way between the main track and a side track, upon which they could walk in safety. The

freight train, which the foreman had noticed and warned Hills of, was coming from the east on the main track of the railway and passed through the village of Williamston without stopping. It was the custom of such trains when approaching Williamston to shut off steam and slow down to from 8 to 12 miles an hour until they could catch the signal, when, if a stop was not indicated, they would increase their speed and proceed without stopping. No stop signal was set for this train on the day in question, and it passed through the yards between the car house and the depot at an estimated speed of from 15 to 18 miles an hour. The conductor and fireman of the train testified that before catching the signal the train slowed down to 10 or 12 miles. A witness named Whipple, who was loading a car with hay at some sheds located 12 or 15 rods west of the hand car house, testified that as the train was approaching he saw a fellow coming from the west on a run pulling on his coat, and noticed him stop on the north side of the track and look to the east; from his actions witness thought he was a brakeman waiting for the train, and that the train stopped, but "they hit up quite a clip just as soon as the engine got by there;" that this was about 50 rods from the place where the man was killed by the switch. Being asked if the man he then saw was deceased, he replied:

"It was a man with a fur cap on, and when I see who was lying on the ground it looked just like the coat he was putting on and the cap he had on, and that is all I know about it."

A short time after the train had passed, the body of Hills was found lying beside the main track approximately 950 feet west of the hand car house and about 1,000 feet east of the depot near a stub switch, a lantern prong of which was bent to the west. There were no eyewitnesses to the accident. The manner in

which it occurred was a matter of inference from surrounding facts and circumstances proven.

. It was the theory in behalf of claimant that deceased was accidentally struck by the train as he was traveling along the track towards his home and thrown against the switch standard which stood about 20 feet east of where his body was discovered. Respondents contended that shortly after leaving the car house, and near the highway crossing, deceased boarded the train, which was moving slowest at that point, intending to ride as far as the depot, near his home, and drop off, but that as the train increased its speed on approaching the depot, after ascertaining that there was no signal set for a stop, he either jumped or fell, striking the switch standard, and was thereby killed.

The industrial accident board apparently adopted claimant's theory that deceased walked, or ran, along the railway ahead of the oncoming train for a distance of 930 feet from where he left his fellow workmen at the car house, before the train overtook him at the switch, when, as he started to pass by the light standard on the south near the track, he "walked a little too close to the car and was struck by the train and thrown against the light standard; the force of the impact hurling his body about 20 feet to the west." The board found as a fact that deceased, on his way from the car house to his home for dinner, "was accidentally struck by said train while he was traveling towards the depot and was thrown against the switch standard mentioned in the evidence, causing death." As a conclusion of law it found that:

"He was still his master's servant while so in the act of leaving his employment, and that the employment covers not only the time during which the workman is engaged in his ordinary labor, but also a later time during which he is passing from the surroundings of his employment into surroundings unrelated thereto." Also holding "that deceased was killed by

an accident arising out of and in the course of his employment."

Under the provisions of this act, only that employee is entitled to compensation who "receives personal injuries arising out of and in the course of his employment." It is to be borne in mind that the act does not provide insurance for the employed workman to compensate any other kind of accident or injury which may befall him. The language of the Michigan compensation law is adopted from the English and Scotch acts on the same subject, and, in harmony with their interpretations, has been construed by this court, in *Rayner* v. *Furniture Co.,* 180 Mich. 168 (146 N. W. 665), as meaning that the words "out of" refer to the origin, or cause of the accident, and the words "in the course of" to the time, place, and circumstances under which it occurred.

In *Ayr Steam Shipping Co., Ltd.,* v. *Lendrum,* 6 B. W. C. C. 326, involving a fatal accident attended with uncertainty as to details, the court said:

"I think one may deduce from the decisions (1) that the burden is always upon the applicant to prove that death resulted from an accident arising out of as well as in the course of the employment; (2) that such proof need not be direct but may be by circumstantial evidence, but there must be facts from which an inference can be drawn, as distinguished from mere conjecture, surmise, or probability; and (3) that an award by an arbiter cannot stand unless the facts found are such as to entitle him reasonably to infer his conclusion from them."

It is contended by appellants that the facts proven here do not in reason support the inference of the board as to the manner in which deceased met his death, but, on the contrary, conclusively show that he was killed in an attempt to board or leave a moving train, precluding any award under the ruling in *Pope* v. *Hill's Plymouth Co.,* 5 B. W. C. C. 175, in which case a workman in a colliery going home to his din-

ner on the premises of his employer was killed in attempting to jump on a passing tramcar. It is further urged as a defense that, if it cannot be said as a matter of law a finding of fact should have been made as appellants contend, it should at least be held that the proven facts are equally consistent with either one of the two alternatives, and no inferences can legitimately be drawn to support an award.

We are not prepared to hold that the findings of fact, as to the manner of the accident, are entirely without evidential support, either direct or by inference. They are therefore to be taken as conclusive under the statute. Accepting them as such, do they sustain the conclusion of law that Hills' death arose out of and in the course of his employment?

It is well settled that the burden rests upon the one claiming compensation to show by competent testimony, direct or circumstantial, not only the fact of an injury, but that it occurred in connection with the alleged employment, and both arose out of and in the course of the service at which the injured party was employed.

While occasional exceptions are noted, as in the case of most rules, it is laid down by the authorities as a general rule that accidents which befall an employee while going to or from his work are not to be regarded as in the course or arising out of his employment. Boyd on Workmen's Compensation, § 486; Harper on Workmen's Compensation, § 34; 1 Bradbury on Workmen's Compensation (2d Ed.), p. 404.

This inquiry, therefore, narrows down to whether this is an exception to the general rule. As deceased was doing no work he was required to perform in fulfillment of his contract of employment, the contention that it is an exception rests mainly upon the claim that when killed he was yet on the premises of his employer, going from, and in the vicinity of, his place of employment. No question is involved of exceptions

by the terms of hiring, of the employee being required to work overtime, or of any interruption, unusual kind of work being done, or other special circumstance in connection with the employment. The only unusual and special thing shown in that connection is the fact that at the noon hour, contrary to previous usage and custom, he left his place of employment and fellow workmen to go elsewhere on a mission of his own, not connected with his employer's business, but to please himself; the occasion being that he had failed to bring with him his dinner as was customary with the crew and as he had always done before. Can it be said that he was then engaged in his employer's business, discharging any duty or on any errand connected with his employment?

In applying the general rule that the period of going to and returning from work is not covered by the act, it is held that the employment is not limited by the exact time when the workman reaches the scene of his labor and begins it, nor when he ceases, but includes a reasonable time, space, and opportunity before and after, while he is at or near his place of employment. One of the tests sometimes applied is whether the workman is still on the premises of his employer. This, while often a helpful consideration, is by no means conclusive. A workman might be on the premises of another than his employer, or in a public place, and yet be so close to the scene of his labor, within its zone, environments, and hazards, as to be in effect at the place and under the protection of the act, while, on the other hand, as in case of a railway stretching endless miles across the country, he might be on the premises of his employer and yet far removed from where his contract of labor called him. The protection of the law does not extend, except by special contract, beyond the locality, or vicinity, of the place of labor.

"It is not a sufficient test that the workman should be on the premises of the employer; but it may be sufficient that he is in such a state of proximity as may be treated as a reasonable margin in point of space." *Hoskins* v. *Lancaster*, 3 B. W. C. C. 476.

Upon this subject, and leading directly to the protection which the act gives the employee during the noon intermission, it is said in Boyd on Workmen's Compensation, § 481:

"A workman's employment is not confined to the actual work upon which he is engaged, but extends to those actions which by the terms of his employment he is entitled to take or where by the terms of his employment he is taking his meals on the employer's premises. (*Brice* v. *Lloyd*, 2 B. W. C. C. 26.) In other words a workman does not lose his character as a workman while eating his lunch on his employer's premises at a place where he may safely do so and not at an especially forbidden place or a place of obvious danger. But this rule would not apply to cases where the employee leaves the premises of his employer to eat his lunch during the time set apart for this purpose."

To the same effect it is said in Ruegg on Employers' Liability and Workmen's Compensation, p. 377:

"In one sense, it may be said to be a part of his duty to get to such place, but if his method of traveling is not controlled by the employer, if he is a free agent, it is thought this qualified duty is not sufficient to raise, at the time, the relation of employer and workman.

"The same may be said with respect to the time occupied in returning home from work, and of intervals allowed for meals when spent off the employer's premises." •

The rules of presumption and inference which often go far to assist a claimant in establishing his case where a workman is found dead at the scene of his labor are of scant application here. When the employee dies at his post of duty, a presumption may reasonably be entertained that he was then perform-

ing his duty and engaged in the work for which he was employed, from which a causal relation between his employment and the accident may be inferred; but it is shown here that deceased left the locality and sphere of his employment at a time when work was suspended, that he was doing nothing within the scope of his employment, was not under the direction or control of his employer, and went away for purposes of his own, going where and as he pleased. Though he was traveling on his employer's premises when injured, he was then 950 feet away from where any duty in the line of his employment called him, and had selected his own route. But a short distance from where he left the car house he could have turned by a public street onto a wagon road along which he could have gone to his home, and a safe footpath was also available to him along the right of way. The custom of employees to travel along the railroad in going to and from their work, when it is shown that there was another and safe way which they might have taken, is not of controlling importance. At the same distance deceased was injured, from the place of employment, they would be at most but mere licensees. In *Caton* v. *Steel Co.,* 39 Scot. L. R. 762, it was held that the injury did not arise out of and in the course of the employment of a laborer who, at the conclusion of his day's work, was knocked down and killed by a passing engine 230 yards from where he had been working, while walking home along a private railway track belonging to his employer, which many of the men employed at the same place were in the habit of using in going to and from their work. The court there said:

"The deceased at the time of the accident had ceased his work, had left the place where he did it, and was on his way home. He had at the time no duty to fulfill to his master, and his master had no duty to fulfill towards him. The relation of master and servant had

ended for the day, he having fulfilled his work and left the place where his work was being done."

Under the undisputed testimony in this case, and accepting the findings of fact made by the board as conclusive, claimant has failed to show such relations of cause and effect between the accident and the duties of the party injured to his employer as will support a conclusion of law that the injury arose out of and in the course of the employment.

The decision, or award, herein is therefore reversed and set aside.

BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred with STEERE, J.

MCALVAY, C. J. In my opinion the facts proven were equally consistent with either theory, and no legitimate inference can be drawn to support an award. I am therefore in favor of reversal for this further reason.