(No. 10903.—Judgment affirmed.)

THE OHIO BUILDING SAFETY VAULT COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL BOARD OF ILLINOIS *et al.* Defendants in Error.

*Opinion filed February 21, 1917.*

1. WORKMEN'S COMPENSATION—*burden is upon the claimant to prove injury occurred in connection with employment.* Under the Workmen's Compensation act the burden rests upon the claimant to show by competent testimony not only the fact of the injury but that it occurred in connection with the employment, and he must furnish evidence from which the inference can be logically drawn that the injury arose out of and in the course of the employment.

2. SAME—*absence of direct testimony does not necessarily prevent the Industrial Board from determining the cause of the injury.* The Industrial Board is not permitted, any more than a court or jury, to speculate or guess as to the cause of the injury when no reasonable explanation of the injury can be found in the testimony, but direct testimony as to the cause of the injury is not essential.

3. SAME—*when coroner's verdict is prima facie proof that injury was due to an assault.* Where there is no direct evidence as to whether a night watchman was killed by accident or an assault, the coroner's verdict that the deceased came to his death as the "result of being assaulted and struck on the head" is competent evidence for the claimant under the Workmen's Compensation act and is sufficient *prima facie* proof of the fact of such assault.

4. SAME—*when employer cannot insist in Supreme Court that deceased came to his death by accident.* Where there is no direct evidence as to how a night watchman was killed but it was practically conceded on the hearing that he was assaulted, the chief contention on that hearing being whether such assault arose out of and in the course of his employment, the employer cannot insist in the Supreme Court that the employee came to his death by accident.

5. SAME—*employer may be liable although assailant was a personal enemy of the deceased employee.* Where a night watchman is assaulted and killed while on duty the employer is liable, if other elements required by the Workmen's Compensation act are established, even though the assailant may have been a personal enemy of the deceased employee, provided the assault was made because the deceased was the night watchman and engaged at the time in the duties of his employment.

6. SAME—*what determines whether a risk arises out of and in the course of the employment.* The question whether a risk arises

out of and in the course of the employment does not depend on whether such risk is more than the ordinary risk incurred by other persons but on whether the risk is one peculiar to that particular employment, and the question whether the risks or dangers of any particular employment are greater or less than the risks of other employments need not be decided in determining whether the risk of a certain employee grows out of his employment.

7. SAME—*when an assault upon an employee arises out of his employment.* An assault upon an employee while on duty arises out of his employment where the duties of the employee are such as are likely to require him to deal with persons who are liable to attack him and where the assault is the result of his employment and the performance of his duties.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

ZIMMERMAN & GARRETT, and CHARLES LEROY BROWN, for plaintiff in error.

WILLIAM E. GRIFFIN, (JAMES C. McSHANE, of counsel,) for defendants in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a proceeding before the Industrial Board of Illinois under the Workmen's Compensation act to recover for the injuries causing the death of Jens Christensen, received on the night of December 19, 1914, while in the employ of plaintiff in error. The committee of arbitration, after hearing the evidence, made an award in favor of the applicant, the widow. On petition for review before the Industrial Board the finding of the committee of arbitration was affirmed, and it was adjudged that applicant was entitled to receive from plaintiff in error the sum of $31 a month for ninety-six months from December 23, 1914, the date of Christensen's death. The circuit court, on the case being taken there on writ of *certiorari,* affirmed the judgment of the Industrial Board. The trial judge having cer-

277 – 7

tified that the cause was one proper to be reviewed by this court, it was thereafter brought here by writ of error.

On the hearing before the Industrial Board it was agreed between the parties that both the deceased and the plaintiff in error were working under and subject to the Workmen's Compensation act.

The deceased was sixty-six years old. He had been employed for four years as fireman and night watchman by plaintiff in error in the Ohio building, at the southeast corner of Wabash avenue and Congress street, in Chicago. His custom was to come to his work at about a quarter to six in the evening and to leave at about the same hour in the morning. He left a widow and eight children, all of age except one. Three of the children were living with their parents at the time of the injury. The Ohio building has 160 feet frontage on Wabash avenue and 90 feet on Congress street and contains four stories and a basement. The three upper stories were occupied by various dealers in books, a school of music, a portrait company, and other offices. On the first floor there were a number of stores, some fronting on Wabash avenue and some on Congress street, and the Moffett Photographic Studio was in the rear of the building, fronting on the latter street. The north half of the basement was occupied by the Kercher Turkish Baths. The boiler room was in the southeast corner of the basement. The main entrance was located on Wabash avenue, opening on the first floor into a wide corridor running east and in which were located the passenger and freight elevators and a stairway leading to the upper floors. In the back hall was an iron stairway leading down into the basement. There was also a stairway in the front end of the corridor on the first floor, leading to the basement. As we understand the record there was no entrance to the basement directly from Wabash avenue or Congress street, but there was an entrance directly from Wabash avenue into the rooms of the Kercher Baths, and through them, by doors

opening into the Kercher Baths, one could reach the corridor in the basement, and this was the only way to get into the basement of the building except from the stairways on the first floor. There was a corridor running east and west through about the center of the basement. The Kercher Baths were entirely north of this, and the store rooms, boiler room and other rooms south of it. There was another corridor toward the west end of the basement, running north and south from the foot of the iron stairway to the boiler room, a distance of a little over 40 feet. The boiler room was about three feet below the rest of the basement, with three steps leading down to it from the south end of the last mentioned corridor. At night the only lights usually lit in the basement were one at the foot of the iron stairway and those in the boiler room. The office portion of the building was closed at seven o'clock every night and the doors at the Wabash avenue entrance were then locked. There were no elevators run after that hour and no janitors in the building. The only person thereafter working, outside of the Kercher Baths, was the deceased. While he looked after the building it does not appear that he made regular rounds. He was supposed to see that the Wabash avenue doors were closed and locked and the windows on the upper floors closed and the lights through the building extinguished. He was also supposed to go into the Moffett Studio, at the rear of the corridor on the first floor, and turn on an electric light early in the evening to furnish a window display and an hour or less before midnight to switch this light off. The light was switched off on the night in question. It is said that about midnight it was customary for him to go out and get a bucket of coffee. There is evidence in the record that on the night in question at about that hour he went to a restaurant near by for that purpose. No one knew his custom with respect to locking or unlocking the Wabash avenue doors on the first floor when he went out. About 12:30 o'clock on the night in

question the foreman in the Kercher Baths noticed that the steam was getting low and attempted to communicate with Christensen through a speaking tube reaching to the boiler room, to ask him to furnish more steam. No response could be obtained, and thereupon a colored porter, Jackson, was sent to look up the deceased. On reaching the three steps leading down into the boiler room he saw deceased's lighted lantern, and a moment later the deceased himself sitting on a chair in the boiler room, dazed and in a seriously injured condition, his head and face being very bloody and a pool of blood on the ground beside him. Jackson at once called to another of the bath employees (Maurer) that someone had "killed the night watchman." The foreman and another employee of the bath rooms were called and shortly thereafter Christensen was assisted into the bath rooms, where the blood was washed off his face and he was cared for temporarily. Some of the employees talked to him, and when asked how he got hurt he replied in a fragmentary way, "I hurt my head," "I am awful sick," "I can't do anything at all." Policemen were sent for, and when they came they asked his name, and he answered "Jim," as they understood him. He also stated that he had hurt himself,—that he felt sick. The day engineer, Hinckley, was sent for and reached the Ohio building shortly after one o'clock in the morning. At that time the deceased was in an ambulance about to be removed to a hospital. Hinckley examined the building and testified that he found in the north and south corridor leading from the iron stairway to the boiler room a pool of blood, a spilled coffee bucket, deceased's cap and a gas pipe about four feet long. Hinckley went with a police officer and they found blood on the iron stairway leading up to the first floor of the building and a slight trail of blood led to the door from Moffett's Studio, that door being found open. Spots of blood were also observable in the studio. Hinckley stated, in answer to a question, he thought that after the deceased regained con-

sciousness and found how badly he was hurt he had gone up-stairs to the studio intending to telephone, as he usually used that telephone when he wanted to communicate with anyone outside, and that he thereafter went back to the boiler room, where he was found. The deceased's key ring, which usually contained sixteen keys, was never found. This key ring was carried by Hinckley during the day and contained keys to the entrance doors and various rooms in the building. Hinckley had separate keys to the Wabash avenue entrance, and when he went to let the policemen out at that entrance was surprised to find they had entered that door when they arrived, it being then unlocked. There was no evidence that an attempt had been made to break into any of the stores. The deceased had been paid off a few days before and had the greater part of his half month's wages on his person when he went to work that evening. After his injury only ten cents was found on him, and an Ingersoll watch which he carried was missing. Hankes, one of the employees of the bath rooms, testified that about a quarter to twelve that night, while he was cleaning a bath tub which stood about four feet from the door leading into the basement corridor where the blood was found, he heard some footsteps, which seemed to be going towards the boiler room. He testified that shortly thereafter he heard a crash,—a heavy fall, like an armful of wood being thrown down on the cement floor,—and a second or two later heard a piece of metal strike the floor, ringing out clearly and apparently from the corridor between the stairway and the boiler room, at about where the pool of blood and gas pipe were afterwards found. He also said that the sound appeared something like the breaking of glass or a bucket falling; that about a minute or two afterwards he heard what might be compared to a rattle of a bunch of keys and then footsteps coming rapidly toward him and going up the stairs, the keys still rattling. No other clews in connection with the injury to the deceased were ever discovered. The

testimony is to the effect that deceased was of a peaceable disposition and was not known to have an enemy. The injury from which Christensen died was described by a physician as being an extensive fracture of the skull, extending from before, backward, through the frontal and parietal bones on the right side and transversely through the frontal bone and extending to the base, and the physician stated that death was due to intercranial hemorrhage and fracture of the skull from external violence.

Counsel for plaintiff in error first insist that the burden of proving the essential facts necessary to establish a case rests upon the party petitioning for relief under the Workmen's Compensation act, and that the claimant in this case did not make such proof. Without question the burden does so rest upon the claimant to show by competent testimony not only the fact of the injury but that it occurred in connection with the employment of the deceased. (*Hills* v. *Blair,* 182 Mich. 20; *Dragovich* v. *Iroquois Iron Co.* 269 Ill. 478.) The burden also rests upon the claimant to furnish evidence from which the inference can be logically drawn that the injury arose out of and in the course of his employment. The proof must be based on something more than a mere guess, conjecture or surmise as to what the cause of the injury was. (*Savage* v. *Ætna Life Ins. Co.* (Mass.) 110 N. E. Rep. 283; *Woods* v. *Wilson Sons & Co.* W. C. & Ins. Rep. [Eng. 1913] 569.) It cannot be said that the existence of a certain fact may reasonably be inferred from the evidence when the existence of another fact inconsistent with the first can be from the same evidence inferred with equal certainty. A theory cannot be said to be established by circumstantial evidence unless the facts relied on are of such a nature and are so related to each other that it is the only conclusion that can reasonably be drawn from them. (*Condon* v. *Schoenfeld,* 214 Ill. 226; *Neal* v. *Chicago, Rock Island and Pacific Railway Co.* 129 Iowa, 5.) But the proof of such facts may be made by circumstantial

as well as by direct evidence.   A greater or less probability leading, on the whole, to a satisfactory conclusion is all that can reasonably be required to establish controverted facts. *Devine* v. *Delano, 272* Ill. 166; *Hills* v. *Blair, supra.*

Counsel for plaintiff in error argue that the·injuries from which Christensen died may have been caused by an accidental fall, and that if he fell because of sudden illness plaintiff in error would not be liable.   We do not think that the evidence in any way warrants the conclusion or inference that the injury was caused by a fall.   The evidence showed that the deceased had been in good health; that he had just returned from a restaurant where he had obtained a pail of coffee for his midnight lunch, and no inference could fairly be drawn that he became sick and the injury resulted from his sudden illness.   It was practically impossible to have fractured his skull by an accidental fall in the manner that it was fractured, and there was no proof offered or suggested in the record as to any way in which his skull could have been fractured by a fall, especially without leaving some other marks of injury upon his person, and none were found.   The facts that the deceased's money and his watch were taken and that his keys were also taken point directly to the fact that some person made the assault and took these articles.   On no other theory can these facts be explained.   The evidence shows that the gas pipe was found near the spot where he was evidently assaulted, and while there was no evidence of blood, flesh or hair on it, that is readily explained by the fact that deceased wore a cap, which would prevent the pipe from coming in direct contact with his head.   The fact that the front entrance was open after the accident tends to show that some person had used that entrance in making his escape.   The testimony of the witness Hankes that he heard, at about the time that the assault must have taken place, footsteps, a crash and heavy fall, and immediately thereafter the sound of some metal falling on the floor, then the rattling of keys and

footsteps coming back up the corridor and up the stairs, is consistent with the theory of assault and with no other theory, in view of the other facts proven on this record. The Industrial Board is not permitted, any more than a court or jury, to speculate and in a sense guess between causes when no reasonable explanation of the injury can be found in the testimony, but the absence of direct testimony and the simple suggestion of theories do not necessarily prevent the tribunal hearing the cause from determining the cause of the injury complained of. "The theories suggested may be forced and fanciful, finding no reasonable foundation in the facts proved. They may be explanations which do not explain; which the common sense of the jury, when applied to the testimony, would instantly reject." (*Wabash Screen Door Co.* v. *Black,* 126 Fed. Rep. 721.) We think the theories and explanations of counsel as to the cause of injury other than assault are unreasonable, forced, and not in accord, in any way, with the evidence. The coroner's verdict was introduced on the hearing, in which it was found that the deceased came to his death from intercranial hemorrhage, "a fracture of the skull by external violence, the result of being assaulted and struck on the head by an iron pipe held in the hand of some person whose name to the jury is unknown, in the Ohio building," etc. This evidence was competent and was alone sufficient to make *prima facie* proof of the fact of such assault. (*Grand Lodge I. O. M. A.* v. *Wieting,* 168 Ill. 408; *Stollery* v. *Cicero and Proviso Street Railway Co.* 243 id. 290; *Devine* v. *Brunswick-Balke Co.* 270 id. 504.) Moreover, there is merit in the argument of counsel for defendants in error that plaintiff in error, in view of this record, cannot raise the question whether the deceased came to his death by accident rather than by an assault. It was practically conceded on the hearing that Christensen was assaulted, the chief contention on that hearing being whether such assault arose

out of and in the course of his employment with plaintiff in error.

Counsel for plaintiff in error admit that on this record the inference that deceased was feloniously assaulted is much stronger than any other theory or inference as to the cause of his injury, but they argue that the proof is as consistent with the inference that he was assaulted for personal reasons which had no relation with his employment, as is the inference that the assault arose out of and in the course of such employment. As we understand the briefs, counsel for both parties to this litigation concede that the real question is, "Was Christensen assaulted because he was Christensen, or was it because he was the night watchman of the building?" Even though the assailant was a personal enemy of the deceased, plaintiff in error would still be liable if the assault was made because he was the night watchman, engaged at the time in the duties of his employment. There is, however, no proof in the record that justifies any conclusion that the assault was made by a personal enemy, to avenge a personal wrong or for reasons purely personal to Christensen. On the contrary, all the evidence tends strongly to prove that the assault was made upon Christensen because he was the night watchman of the building, engaged at that time in the line of his duties.

Counsel for plaintiff in error argue at length and with great earnestness, citing many authorities, that the injury did not arise out of the employment. It is a matter of common knowledge that in office buildings, mercantile establishments and other large buildings in great cities such as Chicago, night watchmen are employed. One of their most important duties is that of guarding the premises from trespassers, thieves or night prowlers. Many such persons are known to be desperate, and employees whose duties expose them to contact with them must necessarily incur the danger of being assaulted by them. The owner of this building testified on this hearing that in case of burglary of any kind

he would have expected the deceased to protect the property. The proof also shows that one of the stores in the building had been broken into during the August preceding this fatal injury. The question whether a risk arises out of and in the course of the employment does not depend on whether such risk is more than the ordinary normal risk incurred by other persons, but on whether the risk is one peculiar to that particular employment. Employees engaged in each particular employment are exposed to certain risks that are almost necessarily peculiar to that employment. Whether the risks or dangers of any particular employment are greater or less than the risks of other employments is not essential to be decided in determining whether the risk of a given employee grows out of his employment. In the case of *Andrew* v. *Failsworth Industrial Society*, (1904) 2 K. B. 32, a workman was killed by lightning. In discussing that case it was stated that any man may be struck by lightning, and in many circumstances this will not entitle him to compensation. If, however, the nature of his employment exposes him to more than the ordinary normal risk, the extra danger to which the man is exposed is something arising out of his employment. In that case a workman killed by lightning while working on a high scaffold was held to have met his death by an accident arising out of and in the course of his employment. In *Nisbet* v. *Rayne & Burn*, (1910) 2 K. B. 689, the cashier for a colliery company was murdered and robbed while traveling in a railway train in the line of his employment with money to pay his employer's workmen, and it was held that the injury and death arose out of and in the course of his employment. In *Anderson* v. *Balfour*, (1910) 2 L. R. Ir. 497, it was held that the risk of injury and death at the hands of poachers was incidental to the employment of a game-keeper. In *Weekes* v. *Stead*, (1914) W. C. & Ins. Rep. 434, the yard foreman of a firm of furniture movers was assaulted in the yard by a man who was employed by the firm at times to

do odd jobs.   The main duty of the foreman was the hiring of such men.   The evidence showed that the assault was made because of a dispute between the foreman and this man about the work of the company.   The company was held liable for the assault.   In *Trim Joint School* v. *Kelly,* (1914) W. C. & Ins. Rep. 359, a teacher in an industrial school was assaulted by a number of pupils and received injuries which resulted in his death.   It was held by the majority of the court that the injury arose out of and was in the course of the employment.   To the same effect is *Emmert* v. *Trustees of Preston School of Industry,* 1 Cal. Ind. Acc. Com. Dec. (No. 4, 1914,) 17.   In the case of *In re McNichol's case,* 215 Mass. 497, a workman was assaulted by a drunken fellow-workman who was in the habit of getting drunk and then becoming quarrelsome. It was held that the accident arose out of and in the course of the employment.   The court in its opinion said (p. 498) :   "It is sufficient to say that an injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform   It 'arises out of' the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury.   Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation, as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment."   In *Challis* v. *London and Southwestern Railway Co.* (1905) 2 K. B. 154, an engine-driver was struck by a stone thrown willfully by a boy from an overhead bridge.   It was there held that the accident arose out of and in the course of the employment of the engine-driver. In the recent case of *Chicago Dry Kiln Co.* v. *Industrial Board,* 276 Ill. 556, this court held that a night watchman

who was injured by an employee of one of the tenants of the employer was injured in the course of the employment. The night watchman gave permission to one King, an employee of one of the tenants, to leave his motorcycle in one of the buildings. King later asked for his motorcycle, having in the meantime become intoxicated, and a dispute arose between them as to the lock on the building in which the motorcycle was placed. During the scuffle the night watchman was injured. Under the reasoning of these cases, in the light of their facts, especially the case decided by this court last cited, we think it must be held that Christensen's injury arose out of and in the course of his employment.

Counsel for the plaintiff in error rely upon *Walther* v. *American Paper Co.* 99 Atl. Rep. (N. J.) 263. In that case a night watchman in a mill, while making his rounds, was struck over the head and killed by an employee of the same company, who had entered the mill and hid himself without any intent to rob the mill office or to commit any other crime except to rob the deceased, who he knew had been paid off that day. It was held that the watchman's death did not arise out of his employment. In that case the proof was clear that the attack was personal upon the night watchman and not for any other purpose. The facts here strongly tend to show that the assault was made upon the deceased for other than personal reasons, and that the taking of his money and watch was a mere incident to the assault upon him for other reasons.

Counsel for plaintiff in error also rely upon the reasoning in the two cases of *In re Harbroe,* 111 N. E. Rep. (Mass.) 709, and *Schmoll* v. *Weisbrod & Hess Brewing Co.* 97 Atl. Rep. (N. J.) 723. We think those cases are clearly distinguishable, on the facts, from this case, and while some expressions are found in those two opinions tending to uphold the reasoning of counsel for plaintiff in error in this case, we do not think such reasoning can con-

trol here. The deceased, because of his employment, was required to guard the building from trespassers or other intruders, and on this account he necessarily might have to deal with persons more or less regardless of the rights of others. Those required to deal with such persons run a risk of encountering violence. Under the evidence in this case the injury is fairly traced to the employment of the deceased as the proximate cause,—an injury which came from a hazard to which Christensen would not have been equally exposed apart from his employment. The danger of this injury was peculiar to his line of work and not common with all other kinds of employment. We are not intending to hold that any assault on an employee while in the discharge of his duties arises out of his employment. Such an assault only arises out of his employment in a case where the duties of the employee are such as are likely to cause him to have to deal with persons who in the nature of things are liable to attack him. In this case we think the evidence is consistent with the theory that the motive of the assailant was not only to rob the deceased but to burglarize the premises, and the fact that he did not break into any of the stores or take any property except from Christensen's person is not inconsistent with this conclusion. It is not unlikely that the intruder expected to burglarize the premises but unexpectedly came upon or was discovered by the watchman, and assaulted him without previously planning to do so if they did not meet. He may have been frightened away by the commotion at the time the deceased was found by the employees of the Kercher Baths, or may have taken the keys of the building with the intention of burglarizing the building at some future time. The evidence does not show that the attack was made upon Christensen for reasons purely personal to him.

Counsel for plaintiff in error argue that one presumption cannot be based upon another presumption; that while it is highly probable that Christensen was murdered, that

presumption or inference, however strong, is only an infer-
ence; and that upon the inference that he was murdered the
court cannot base another independent inference that the
murder was committed under such circumstances as to make
it an injury arising out of his employment, and that there-
fore the finding of the Industrial Board cannot be sustained.
We do not agree with the conclusion of counsel for plaintiff
in error that the inference that Christensen's injury arose
out of and in the course of the employment is founded
solely, or largely, on the inference that he was murdered.
"The terms 'inference,' 'probability,' 'assumption' and 'pre-
sumption' have substantially the same meaning and import
as used in legal writings and opinions. Attempts have been
made from time to time to draw distinctions between cer-
tain of these terms, but legal as well as common parlance
recognizes no such refinements of meaning." (10 R. C. L.
867, 868.) Counsel use in this case the words "inference"
and "presumption" interchangeably. It is true that courts
have frequently stated that a presumption cannot be based
upon a presumption or an independent inference on another
inference. (*United States* v. *Ross,* 92 U. S. 281; *Atchi-
son, Topeka and Santa Fe Railway Co.* v. *Baumgartner,* 10
Ann. Cas. (Kan.) 1094, and cases cited in note; *Globe
Accident Ins. Co.* v. *Gerisch,* 163 Ill. 625; Jones on Evi-
dence,—2d ed.—sec. 104; 10 R. C. L. 870; 22 Am. & Eng.
Ency. of Law,—2d ed.—1236.) Where there is no eye-
witness the fact at issue may be proved by circumstantial
evidence. Such evidence consists of proof of certain facts
and circumstances from which the court may infer other
connected facts which usually and reasonably follow ac-
cording to the common experience of mankind. The gen-
eral rule is that all facts are admissible in evidence which
naturally and logically tend to prove or disprove the fact in
issue. (11 Am. & Eng. Ency. of Law,—2d ed.—502; *State*
v. *Avery,* 113 Mo. 475.) The authorities, in laying down
this rule as to presumptions which counsel for plaintiff in

error are here invoking, frequently state in the same connection that the fact presumed should have a direct relation with the fact from which the presumption is drawn, or, as stated in *United States* v. *Ross, supra,* on page 283, (which case is more often quoted as to this rule, perhaps, than any other) : "No inference of fact or of law is reliably drawn from premises which are uncertain." Or, as again stated in *Manning* v. *Insurance Co.* 100 U. S. 693: "The law requires an open and visible connection between the principal or evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences." It is clear from the discussion of the authorities on this question that what they mean by this rule is that a presumption cannot be based on a presumption, because in that case the second presumption is not clearly and satisfactorily proved. It means somewhat the same as the rule that evidence will not be received which is not relevant to the fact in issue, for one of the principal tests of admissibility is the connection of the facts proved with the offense charged. Evidence which has a natural tendency to establish the fact in controversy should be admitted. (*Commonwealth* v. *Merriam,* 14 Pick. 518; *People* v. *Jennings,* 252 Ill. 534.) Certain well recognized authorities insist that the rule that a presumption can never be based on a presumption or an inference on an inference is never strictly followed. To illustrate this, one author states that the fact that the defendant "made a plan to commit the crime charged is everywhere admissible in evidence against him, and where the parties have not themselves confessed to having such a plan the fact must necessarily be proved by the surrounding circumstances. The facts that defendant bought a gun and that he thereupon lay in wait for another are facts from which may be inferred his plan to commit a crime, and his having such a plan is a fact from which his guilt may be inferred. This is an inference from an inference, and yet courts universally admit such evidence." (Wills on Cir-

cumstantial Evidence,—Am. ed. 1905,—18*g*.) It is stated by others that the rule that an inference can never be based upon an inference, if strictly enforced, would never permit a criminal case to be adequately prosecuted. (*Rex* v. *Burdett,* 4 B. & A. 95; 1 Wigmore on Evidence, sec. 41.) Whatever the rule is or ought to be, no authority called to our attention has ever enforced it in the way contended for by counsel for plaintiff in error in this case. The inference that the deceased was assaulted by some unknown person is one that is clearly deducible from all the facts and circumstances proved on the hearing. The Industrial Board, in reaching the conclusion that such injury was one that arose out of and in the course of the employment was not forced to base that conclusion upon the inference of the murder, but rather upon all the facts and circumstances in the case, many of these facts and circumstances being the same as those upon which was based the inference or conclusion that the deceased was murdered. This case, on this question, comes within the reasoning in *United States* v. *Ross, supra,* where the court said, in commenting on another case (p. 285) : "The question was whether seventy-three bales of cotton of the plaintiff's had been forwarded, with a much larger amount, to the officer in charge of military transportation at Nashville and by him turned over to the treasury agent. There was no direct proof that the plaintiff's cotton was included in the shipment, but there was proof that the treasury agent forwarded the cotton received by him to the supervising agent at Cincinnati, where a sale was soon after made, and some of the bales sold were marked with the plaintiff's mark. The question, therefore, whether the military officer who shipped the large quantity had shipped with it the cotton of the plaintiff was not left to depend upon the presumption that he had done his duty. There was distinct and independent proof of it in the fact that some of the plaintiff's cotton had reached Cincinnati and had been sold there. The presumption was

only confirmatory of what had been proved by evidence, and in confirmation of that proof it might be invoked." The late Justice Baker, who wrote the opinion of this court in *Globe Accident Ins. Co.* v. *Gerisch, supra,* also wrote the opinion in *Morris* v. *Indianapolis and St. Louis Railroad Co.* 10 Ill. App. 389. The opinion in this last case states (p. 395): "There is here an open and visible connection between the facts out of which the first presumption arises and the fact sought to be established by the second presumption. In reality the two presumptions are so intimately connected that they both naturally arise out of the same set of circumstances and are component parts of the same transaction." It was held that in that case both presumptions were sustained by the same evidence. The same may be stated here. The conclusion that the injury arose out of and in the course of deceased's employment was not based upon the mere fact of murder. For the most part, if not entirely, it rested upon the facts proved,—the character of the duties of the deceased, the place and hour when those duties were required to be performed, the likelihood of persons accustomed to deeds of violence getting into those premises during the night time and making such an assault, and other considerations of like character. This last presumption, if it was based in any way upon the former presumption, was only confirmatory of what had been proved by the evidence. There is here open and visible connection between the facts out of which the first presumption arises and the fact which the second presumption tends to establish. Therefore, even under the rule as to presumptions contended for by counsel for plaintiff in error, the finding of the Industrial Board on the controverted questions in this case should be sustained.

We have not attempted to discuss or even refer to many of the decisions cited by counsel in the briefs. We have referred to some of those that we thought were the most in

277 − 8

point on the facts here presented. Any attempt to discuss in detail all of those cases would be of no special advantage to either party and would unduly lengthen this opinion.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*