SCHEER *v.* HOLMES.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—PERSONAL
    INJURIES—DEATH—EVIDENCE—REVIEW OF AWARD.

In proceedings under the workmen's compensation act for
    compensation for the death of a previously healthy man
    claimed to have been due to the fall of a very heavy box
    on one of his legs, resulting in a split knee-cap and tear-
    ing of the muscles from the leg, death following seven
    weeks later, evidence *held,* not tending to show that death
    was caused by the injury so as to make the finding of
    the industrial accident board conclusive; and the award
    thereunder is reversed.[1]  BIRD, MOORE, and FELLOWS, JJ.,
    dissenting.

Certiorari to Industrial Accident Board.  Submitted
April 11, 1917.  (Docket No. 134.)  Decided Septem-
ber 27, 1917.

Emma Scheer presented her claim for compensation
against Herbert R. Holmes for the accidental death
of her husband in defendant's employ.  From an or-
der awarding compensation, defendant and the Royal
Indemnity Company, insurer, bring certiorari.  Re-
versed, and award vacated.

*Frederick J. Ward,* for appellants.

*Vincent M. Brennan,* for appellee.

MOORE, J. (*dissenting*).  Herbert R. Holmes was
engaged in the trucking business on March 2, 1915,
and was operating under the workmen's compensation
act of the State of Michigan, with the Royal Indem-
nity Company as the insurer under said act.  On that
date Carl Scheer, an employee of said respondent, re-

[1]Generally on construction and effect of workmen's compen-
sation acts, see notes in L. R. A. 1916A, 23; L. R. A. 1917D, 80.

ceived an injury to his right leg, and on March 23, 1915, he and said Royal Indemnity Company, as insurer, entered into an agreement regarding the payment of compensation, which compensation was paid to him as long as he lived.

On April 26, 1915, Mr. Scheer died, leaving the claimant, his widow, as the only dependent. Claim was made for compensation. The case was brought on for hearing before an arbitration committee who rejected the claim. The claimant appealed to the industrial accident board, and the same was set for a hearing. The respondents were not at the hearing because, it is said in the brief, the street car traffic broke down, and their representative was delayed, so that he did not get to Lansing from the city of Detroit until after the case had been heard by the industrial accident board. The industrial accident board awarded compensation to said claimant at the rate of $5.50 a week for 300 weeks. A motion for a rehearing was overruled by the industrial accident board.

This proceeding is to review the action of the industrial accident board in making its award. The determining question is: Was there evidence legally justifying the decision of the accident board that Mr. Scheer died as the result of an injury while in the employ of Mr. Holmes? It is not disputed that while so employed on March 2, 1915, while unloading a box of hardware weighing about 800 pounds, the box fell upon the right leg of Mr. Scheer, inflicting considerable injuries, but it is insisted there is no legal proof that these injuries caused the death of Mr. Scheer.

Section 12 of part 3 of Act No. 10, Extra Session of 1912 (2 Comp. Laws 1915, § 5465), makes findings of fact made by the accident board conclusive in the absence of fraud, if any competent legal evidence is produced to sustain the facts so found. This section has frequently been construed by this court. Some

of the decisions are: *Rayner* v. *Furniture Co.*, 180 Mich. 168 (146 N. W. 665, L. R. A. 1916A, 22, Am. & Eng. Ann. Cas. 1916A, 386); *Reck* v. *Whittlesberger*, 181 Mich. 463 (148 N. W. 247, Am. & Eng. Ann. Cas. 1916C, 771); *Hills* v. *Blair*, 182 Mich. 20 (148 N. W. 243); *Estate of Beckwith* v. *Spooner*, 183 Mich. 332 (149 N. W. 971, Am. & Eng. Ann. Cas. 1916E, 886); *Redfield* v. *Insurance Co.*, 183 Mich. 638 (150 N. W. 362); *Buhse* v. *Iron Works*, 194 Mich. 413 (160 N. W. 557).

The record is not as satisfactory as could be desired. Some of the witnesses were dull and made contradictory statements, possibly because they did not understand the questions put to them. The claimant testified that at the time of the accident her husband was a strong, healthy man weighing about 160 pounds; that she met him at the door when he was brought home, and she and his boss helped him into the house; that his leg was swollen from the day he got hurt; that a doctor was called; that Mr. Scheer was confined to his bed, except as he supported himself on two crutches; that he did not improve, and another doctor was called, until six in all had been in attendance upon him, when he died.

"*Q.* Did Dr. De Witt ever tell you at that time that your husband would not live?

"*A.* Yes, he told me.

"*Q.* When was that, how long before his death?

"*A.* That was just before they operated on him. He said your husband is going to die. He heard him.

"*Q.* Was it spoken loud enough so he could hear?

"*A.* Yes; it was spoken loud enough. * * *

"*Q.* Do you remember the exact words Dr. De Witt used when he said your husband would not live?

"*A.* He said, 'Your husband is going to die.' That is all I understand.

"*Q.* How long afterwards was it before he died?

"*A.* Why, I guess it was going on the second week, or third week; I don't remember any more."

The record does not disclose anything further about the operation. She testified on cross-examination:

That there were times during his illness as a result of the accident when Mr. Scheer was out of his mind.

"*Q.* When your husband came home Mr. Holmes was with him?

"*A.* Yes.

"*Q.* The injury was to his knee?

"*A.* His right leg.

"*Q.* Whereabouts; was there a bruise on his leg or foot?

"*A.* Yes; there was a couple of bruises on the middle part of his leg.

"*Q.* About halfway between the knee and the ankle?

"*A.* No.   *   *   *

"*Q.* No.  You say the leg was getting better; the swelling was going down; it was getting better wasn't it?

"*A.* I don't know; I didn't have the feeling of it.

"*Q.* And you don't know what caused the condition of your husband's health do you?

"*A.* No.

"*By Mr. McCredie: Q.* You say the swelling went up his hip and into his side?

"*A.* Yes.

"*Q.* You say in the first instance it was swollen from the knee down and then the swelling went up the leg?

"*A.* Yes.

"*Q.* Did the swelling go out of the leg or not?

"*A.* No.

"*Q.* Then it still continued and the side began to swell?

"*A.* Yes.

"*Q.* And could you say that he never after the accident stepped on his foot?

"*A.* No; he never.   *   *   *

"*By Arbitrator Baugh: Q.* After the swelling started to go into his side was his leg swollen from the hip into the side?

"*A.* Yes.

"*Q.* It came up the right leg and was swollen up to the hip?

"*A.* Yes; the whole lower part of his body was swollen.

"*Q.* Was the right limb swollen?

"*A.* His hip was swollen.

"*Q.* Just his hip?

"*A.* More than his hip; the lower part of his body was all swollen.

"*Q.* Was the left leg swollen?

"*A.* As far as the hip.

"*Q.* After the swelling of the knee commenced to go down, did the other swelling go down?

"*A.* No."

Another witness testified:

That he saw Mr. Scheer within three or four days of the accident and helped take care of him; that his leg was bruised and swollen, and that he could not use it; that he appeared to be suffering from pain; that there were times when he was unconscious.

"*Q.* Did he know you?

"*A.* He did when I came, but he got worse later on in the evening.

"*Q.* Lapsed into unconsciousness?

"*A.* Yes, sir.

"*Q.* Did you see his leg at that time?

"*A.* Yes, sir; I did.

"*Q.* What was its condition?

"*A.* Why it was swollen. I helped bandage it, and at that time it was swollen, and it seemed as though all the life was getting out of the foot.

"*Q.* Was it withering up?

"*A.* Yes; and he was kind of drying up, all the way through, the whole side. His other foot was getting smaller. You could see it was fading away then.

"*Q.* How much would you say that he would weigh, in your judgment, at that time?

"*A.* Oh, about 110 or 115 pounds.

"*Q.* And at the time that he was hurt you testified that he weighed upwards of 160?

"*A.* Well, 160 or 165, I should judge.

"*Q.* And in the space of about six weeks—

"*A.* 6 or 7 weeks, I guess.

"*Q.* —went to 110 pounds?

"*A.* 110 or 115 pounds. Oh, he was awful."

On the cross-examination he testified in part:

"*Q.* Now, the last time you saw him, at least you said it was the last, well this last time you saw him prior to the night before he died, you said the time before that that the leg was swollen, and the other leg appeared to be drying up. Now you say the leg was swollen?

"*A.* Yes.

"*Q.* What caused that swelling, do you know?

"*A.* Well, I suppose from the injury.

"*Q.* You suppose?

"*A.* From the injury.

"*Q.* Do you know for sure?

"*A.* I don't know.

"*Q.* When you say the leg was swollen up, you don't know what the reason of the swelling was, do you?

"*A.* I suppose it was the injury, but I don't know.

"*Q.* You don't know positively?

"*A.* No.

"*Q.* What was the condition of the leg, what did it look like?

"*A.* Why it was—

"*Q.* Was it red, white, black, or blue?

"*A.* Well, it was not a regular color; it was a kind of a blue color like. * * *

"*Q.* And what did the laceration on the knee look like at that time?

"*A.* I didn't see the knee.

"*Q.* Did you see the part below the knee?

"*A.* I seen the foot and the other leg.

"*Q.* Did you see the knee?

"*A.* The knee was bandaged.

"*Q.* Did you see the part of the leg that was injured?

"*A.* No; I didn't. Below the bandage it was swollen.

"*Q.* You can't say that that was from the accident?

"*A.* I presume it was.

"*Q.* Will you swear positively it was from the accident?

"*A.* I would so far as I know.

"*Q.* How do you know that?

"*A.* Well, there was nothing else that would cause it.

"*Q.* Assuming this man was suffering from some other disease that would cause swelling?

"*A.* Well, probably—

"*Q.* Would you have been able to tell whether that was from the disease or from the accident?

"*A.* Well, would it not be on the other leg; would not both legs be swollen?

"*Q.* You say on the night before he died he had aches and pains all over?

"*A.* Why, he was rolling his eyes, well, he was fading away.

"*Q.* Do you know what this man died from?

"*A.* From the injury of the leg, as far as I know.

"*Q.* How do you know that?

"*A.* Well, because he was laid up from the injury, and he never got out of the house after that.

"*Q.* Did you see the death certificate?

"*A.* No; I didn't.

"*Q.* Well, you know, don't you, that there is a death certificate filed showing the cause of death?

"*A.* I suppose so.

"*Q.* When you say this man died from the injury, it is an opinion of yours, isn't it?

"*A.* From my judgment of being with him; yes.

"*Q.* And you are not a doctor?

"*A.* No, sir."

Another witness testified that he was sent from the factory at the time of the accident to take Mr. Scheer's place.

"*Q.* What was his condition then?

"*A.* He lay down. He was sitting on a box with his legs laying down.

"*Q.* And how did you happen to see him there?

"*A.* I was called up to go and take Mr. Scheer's place; he had been hurt.

"*Q.* Did you take his place?

"*A.* Yes.

"*Q.* Did you see the box?

"*A.* Yes.

"*Q.* Where was the box?

"*A.* Well the box stand on the ground.

"*Q.* How heavy was the box?

"*A.* It would weigh 700 or 800 pounds.  *  *  *

"*Q.* How long did you see him sitting there on the box?

"*A.* About 10 or 15 minutes.

"*Q.* Then what happened?

"*A.* Then the boss was right after me, Holmes.

"*Q.* Did the boss take him home?

"*A.* Holmes was right after him, talked to him.  I took his truck and drive away.

"*Q.* Did you see Mr. Scheer get off the box and walk?

"*A.* No.

"*Q.* When you went away he was still sitting on the box?

"*A.* Still sitting on the box."

In the agreement in regard to compensation is the following:

"On or about March 2, 1915, while injured was at work at the Trio Manufacturing Company at Warren and Bellevue avenues, unloading a box of hardware, weight about 800 pounds, he slipped and lost his foothold, and box fell on his leg, splitting his kneecap and tearing the muscles from flesh."

The case then shows an accident to a healthy man weighing nearly 160 pounds, resulting in a split kneecap and the tearing of the muscles from the flesh, followed immediately by a swelling of the knee and leg, and a condition that grew worse so that several doctors were called, and the victim of the accident, instead of improving "faded away," as some of the witnesses expressed it, until he weighed but 110 or 115 pounds, and died less than seven weeks after he was hurt.  We think the inference that the death was the result of the injury is not far-fetched.

The award should be affirmed, with costs to claimant.

BIRD, J., concurred with MOORE, J.

OSTRANDER, J.  There is in the record no testimony fairly tending to prove that the described injury was the cause of the death of claimant's intestate.  For this reason the award should be set aside.

KUHN, C. J., and STONE, STEERE, and BROOKE, JJ., concurred with OSTRANDER, J.

FELLOWS, J. (*dissenting*). After a careful examination of the record in this case, I find myself unable to agree either with Mr. Justice MOORE, that "the inference that the death was the result of the injury is not far-fetched," or with Mr. Justice OSTRANDER that there is no testimony to support the finding. I think the finding of the industrial accident board is far-fetched, but that there was some proof which would authorize the board to make such finding if it was so disposed. The committee on arbitration who heard and saw the witnesses disallowed the claim. Six doctors attended the deceased during his illness. No one of these doctors was produced at the hearing, and the failure to produce them or any of them is unexplained. If it were within the province of this court upon certiorari to the board to correct errors of fact this case should be reversed. But under the act creating the industrial accident board the power of this court to reverse is limited to errors of law. Because of this want of power in this court to correct erroneous findings of fact by the board, I am constrained to be for affirmance.