RAILWAY COMPANY *v.* HENDERSON.

Opinion delivered March 11, 1893.

1. *Sufficiency of evidence—Inconsistent theories.*

Where the evidence tends equally to sustain either of two inconsistent propositions, a verdict in favor of the party bound to maintain one of them against the other is necessarily wrong.

2. *Entries by third person—When inadmissible.*

Book entries made in the ordinary course of business by an agent, unauthenticated by his oath, are not admissible, upon proof of his handwriting and that his present residence is unknown, without showing whether any effort has been made to ascertain his residence.

3. *Evidence—Purpose for which car is required.*

Evidence that, in making requisition on a connecting carrier for a car, a railway company is required to give information of the use to be made of the car, and of the place to which it is to be sent, is admissible to show that the connecting carrier knew the purpose for which a car was required.

4. *Negligence of carrier—Car infected with cattle fever.*

Where a railroad company furnishes the car and fixes the joint rate of compensation for transportation of cattle over a connecting line as well as its own, it cannot escape liability for negligence in furnishing an infected car on the ground that the bill of lading was not signed by its agent but was signed by the initial connecting carrier.

5. *Instruction—Verbal inaccuracy.*

An instruction which says "if the jury believe," instead of "if the jury believe from the evidence," will not be ground for reversal where the objection was not called to the trial court's attention.

Appeal from White Circuit Court.

GRANT GREEN, JR. Judge.

Action by Henderson & Jelks against the St. Louis, Iron Mountain & Southern Railway Company. The complaint substantially alleged that plaintiffs purchased, at Auvergne, in Jackson county, Arkansas, 13 head of Jersey cattle; that their vendor, J. T. Henderson, contracted with the Batesville & Brinkley Rail-

way Company to transport the cattle from Auvergne to Searcy in White county, Arkansas ; that the latter company furnished a car, which it had obtained from defendant railway company, for the purpose of transporting the cattle ; that the car so furnished was at the time infected with the germs of Texas or Southern cattle fever ; that said infection was produced by the droppings of diseased cattle which had been transported therein, and that defendant had negligently permitted such droppings to remain in the car until it had become infected with the germs of the cattle fever ; that, by reason of said infected condition of the car, plaintiffs' cattle became infected with the fever, and in a short time after their arrival at Searcy nine of them took sick and died.

The answer admitted " that J. T. Henderson had made a contract with the Batesville & Brinkley Railway Company, as mentioned in the complaint.  It denied that it furnished the said Henderson, at Auvergne, or elsewhere, a car as alleged.  It denied that the car in which said animals were transported belonged to the defendant company, or that it had carried any cattle diseased with the Texas or Southern cattle fever, as alleged in the complaint.  It denied that plaintiff's cattle contracted the Texas or Southern cattle fever by reason of any act of negligence or carelessness on its part.  It denied that the said cattle died of Texas or Southern cattle fever, or that it was in any manner responsible for their death, injury or sickness."

J. T. Henderson, the vendor of the cattle, testified : " that, in the summer of 1889, he sold twelve head of cattle to Henderson & Jelks for $100 per head. After selling the cattle, he went to Mr. Flynn, superintendent of the Batesville & Brinkley Railway Company for a rate to Searcy, and Flynn told him that, as the stock would have to pass over the Iron Mountain and Searcy & West Point Railroads, to get a spe-

cial rate from the Iron Mountain for the entire haul. Witness did get a special rate at $25 per car from Auvergne to Searcy. After the rate was given him, he then asked the Batesville & Brinkley Railway Company for a car, and on July 17th Missouri Pacific car No. 6335 was furnished witness and placed at the station of Auvergne by the Batesville & Brinkley Railway Company. Witness then signed the live stock contract in evidence. After making the contract, witness and one of his hands went into the car at Auvergne and cleaned it out. There was some manure, sawdust and coal in the bottom of the car. Witness took the shovel and endeavored to throw it out, but it was so hard and caked so hard to the bottom of the car, that he found it more work than he cared to do, so he stopped and did not throw it out. There was about two or three inches of the stuff on the floor. Witness then had his wagons haul several loads of pine sawdust, and he himself had the floor of the car all thoroughly covered with pine sawdust from five to six inches deep. After this was done, he then led his stock, one at a time, into the car, and tied each head to the slats of the car. The cattle were in apparent perfect health. There had been no disease on his place or among his cattle, and none of the cattle had been sick before they left his place; there had been no Texas or Southern cattle fever on his farm, although there had been some at that time at Newport, in Jackson county, nine miles distant. Witness heard of no Texas fever nearer his place where the cattle were shipped than Newport, which was nine miles. He had about seventy-five or one hundred head of cattle. They had all run together in the same herd. There were none sick, and those that remained remained perfectly healthy. In putting the cattle in the car, witness tied each one of them to the car, giving enough length in the rope to allow the cattle to eat, drink or lie down. This is the way he usually shipped them, and he

considered it the best way. What little manure and and sawdust witness took from the car was taken from the middle of the car."

David Brennan, a witness, was present when the cattle were loaded upon the car at Auvergne on the Batesville & Brinkley Railroad. J. T. Henderson, the shipper, B. B. Phillips, Boyd Drennan and himself were present and assisted witness in loading the cattle. They were loaded about 3:30 on the afternoon of July 17th. The agent of the Batesville & Brinkley Railroad was present. The loading was superintended by himself and J. T. Henderson, the shipper. Witness took care of the cattle all the way while on the train. Witness had a pass over the road, and it was his name signed and endorsed on the live stock contract in evidence. The cattle were seventeen hours on the cars, coming ·from Auvergne to Searcy. Witness examined the car before it was loaded at Auvergne and it had been occupied by cattle. It had been loaded with wood and stoves prior to loading the cattle, but apparently had been quite recently occupied by cattle. Witness made a personal effort to clean out the car before loading the stock. It looked like it had been recently loaded with wood and stoves, and sometime prior to this with cattle, and it looked like it had been used in the transportation of coal, wood or stoves within the last six months prior to its being loaded at Auvergne. Defendant knew that the State of Texas was infected with Texas or Southern cattle fever. He did not know of any well established line running north or south of Little Rock that would contain all the territory infected with the disease. He did not know whether Arkansas or any part of it was within the infected district. He knew that in Jackson county, all during the summer 1889, there had been Texas fever at Newport."

Dr. J. M. Jelks, one of the plaintiffs, testified that their cattle reached Searcy on July 17th, 1889, and were delivered to them by the Searcy & West Point Railroad. They were unloaded, driven through Searcy and about half-mile on the west side of town, and there put in a 40-acre field. This field had been open for a long time, and all of the cattle in the neighborhood had been in the habit of grazing on the field, and, just before the Jersey cattle arrived, witness fenced up the field and placed their cattle in it. About two weeks after this stock arrived, they commenced getting sick. A cow took sick first, and died in two or three days afterwards. Nearly all of the balance of the cattle took sick and nine of them died after three or four days' sickness. The bull was not put with other cattle in the pasture. He was kept in a stall in the livery stable just across the street from the court house, was watered and fed in the stable. He was only out once or twice and then in a small lot of perhaps an acre where Mr. Rogers kept his family cow. The bull died with the same disease the others died with. The heifer which was sent to the college ran in the pasture with the other cattle, but she did not die. Witness had heard of no other cattle dying about Searcy at that time.

J. T. Flynn, superintendent of the Batesville & Brinkley Railway Company, testified, with reference to the car in which the cattle were transported, as follows : "I do not know how the car was obtained. I do not know who made the order, nor what was said to the agent of the Iron Mountain Railway ; I only know I directed our agent there (Newport) to get a car. I did not get the car myself." The following question was then asked him, over defendant's objection : Q. "In order to have gotten this car for the purpose of shipping J. T. Henderson's cattle, what information would you have to give in order to get the car you wanted ?"

The answer was permitted to be given over objection: A. "In making requisition for cars, we had to give our connecting carrier information for the purpose we had to use the car, and for what point it was destined."

J. R. Hubbard testified "that he was agent of the defendant railway company at Diaz, a station three miles north of Newport, and had in charge the records of that office. He stated that J. W. Clayton was the agent at Diaz during the year 1889, and had kept the records there; that Clayton was not in the employ of defendant railway company, having left its employ in August, 1890, and his whereabouts were unknown." (Counsel for defendant stated that subpoenas had been issued to Woodruff, Jackson and Pulaski counties for J. W. Clayton, and that a special agent had been employed hunting for him for sometime, but that it had been impossible to find his whereabouts.) The following question was then asked witness: "Q. Have you in this court the records of the movements of cars at Diaz during the months of June and July, 1889, and, if you have, please turn to the record of the months of June and July and give us the movements of the Missouri Pacific car No. 6335, during those months, if the same appears upon your records?" To this question plaintiffs objected as incompetent and immaterial. The objection was sustained, and defendant excepted. The defendant then offered in evidence the record kept at Diaz by the defendant railroad company in June and July, 1889, which showed the Missouri Pacific car No. 6335 arrived at Diaz on June 27th, loaded with coal, consigned to W. T. Kelly, division superintendent; that it remained at Diaz loaded with coal on June 28th, 29th and 30th, July 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th, 9th, and on July 10th was unloaded of the coal, and remained at Diaz station, empty, July 10th and 11th, and on July 12th was forwarded empty to Newport, Ark.

The plaintiffs objected to this evidence as incompetent; the objection was sustained, and the defendant was not permitted to introduce the evidence before the jury, to which ruling of the court in excluding this evidence the defendant at the time saved his exceptions.

Dr. R. R. Dinwiddie testified as follows:

"I am the veterinarian in the experimental station connected with the Arkansas Industrial University. I have been engaged in the study and practice of veterinary surgery about seven years, and have been connected with said experimental station for about two years. I practiced my profession in Chicago before coming here. I have studied the disease among cattle called Texas fever for about two years. I have made post-mortem examinations of cattle that died of this disease. This disease is contracted by shipping cattle from the North to infected pastures of the south; this disease cannot be contracted by bringing well cattle in contact with sick ones; that is, it cannot be communicated directly from a sick animal to a well one. This disease cannot be communicated by well cattle being placed in a stable, car or other buildings where sick ones have left their droppings. Only one authority has disputed this theory, and the most common opinion of authorities is, as I have stated it, that it cannot be communicated in that way. Under ordinary circumstances, I think that well cattle could not contract this disease from having been shipped in the same car that diseased cattle had been shipped in and left their droppings in. I have no proof that there ever was any such contagion."

On cross-examination, witness said:

"A part of this State is permanently infected with the germs of Texas fever. The extreme northern part of the State is free from the infection, and there are parts of the center and southern part of the State that are uninfected, but generally the center and southern parts are

permanently infected.   Cattle brought from the uninfected district to the infected district will usually take the disease, and over sixty per cent. of them die in the center and southern part of the State ; north of that the per cent. may be less.   During 1889, our records show that Texas fever was prevalent in Jackson county, at Newport, and along the line of the Iron Mountain Railway.   I was there during August, 1889, and it was infected at that time.   I do not remember how long it had been infected before that time.   Native cattle in an infected district usually do not contract the disease.   Cattle taken from an uninfected district to a different locality and after having been there fourteen days or longer show symptoms of this disease ; the presumption is that the district where they are moved to is infected, unless they have been exposed to the infection during the shipment.   White county lies within the permanently infected region, according to the boundary lines laid down by the Agricultural Department at Washington. Texas fever is not strictly a contagious disease.   It cannot be contracted by a well animal coming in contact with a sick one, but the generally received opinion is that it is contracted by grazing on infected pastures. My opinion is that the infective agent enters the system by way of the mouth.   I cannot call to mind any particular instance of any well cattle from an infected district having contracted the disease merely by being transported in cars which had previously carried Southern cattle, but I have seen cases in the stock yards in Chicago that the infection could only be explained in that way.   I think it has not been proved that the infection arose exclusively from that cause and no other, though it is my opinion that it can be contracted in that way."

This was substantially all of the evidence.

The following instructions asked in behalf of plaintiffs, among others, were objected to, but the objections

were overruled, the instructions given, and the same now assigned as error:

"2. The jury are instructed that if they find from the evidence that the defendant company fixed or assented to the rate of freight for the transportation of the cattle and furnished the car in which they were shipped, knowing that such car was to be used for the transportation of the cattle, then it would be liable to the plaintiffs for any damage they may have sustained by reason of the car being infected with the germ of Texas fever, if it knew, or by reasonable diligence could have known, that such car was so infected."

"3. The jury are instructed that if they find from the testimony that the plaintiffs purchased of one J. T. Henderson, of Jackson county, Arkansas, thirteen head of Jersey cattle, to-wit: twelve cows and one bull, and that said cattle were consigned to plaintiffs in this case at Searcy, Ark., and that plaintiffs were the owners of the same, and that defendants furnished the car in which said cattle were shipped, and the same were transported over the line of the defendant company from Newport to Searcy for a valuable consideration paid to the defendant company, and that the car so furnished was infected with any disease common to cattle, and that such infection was produced or caused by reason of the negligence of defendant by reason of having transported diseased cattle therein, and that the defendant knew, or by reasonable diligence could have known, the condition of the car, and that the cattle so shipped contracted the disease with which said car was so infected, from which they afterwards died, then the defendant company would be liable to the plaintiffs for the value of such cattle as proven, not to exceed one hundred dollars per head, provided you find from the evidence that the car was infected as charged."

The following prayer asked by defendant was refused :

" 13.   If the jury believe from the evidence that the contract for the shipment of plaintiffs' cattle was made by the Batesville & Brinkley Railroad Company with the shipper, and that the car claimed to have been infected was supplied by said railroad company, then you will find for the defendant, even though you further find that the Batesville & Brinkley Railroad Company obtained said car from the defendant company."

The court modified instruction No. 13, over defendant's objection, and gave it in the following form :

"13.   If the jury believe from the evidence that the contract for the shipment of plaintiffs' cattle was made by the Batesville & Brinkley Railroad Company with the shipper, and that the car claimed to have been infected was supplied by said railroad company, then you will find for the defendant, even though you further find that the Batesville & Brinkley Railroad Company obtained said car from the defendant company, unless you believe the defendant knew the car to be infected, or by ordinary care could have ascertained its condition, and that it was to be used in transporting plaintiffs' cattle."

The jury returned a verdict for $900.   A motion for a new trial was overruled, and defendant appealed.

*Dodge & Johnson* for appellant.

1.   The record is silent, and the evidence wanting to establish four necessary facts to sustain plaintiff's cause of action.   There was no evidence (a) that Missouri Pacific car No. 6335 had ever hauled any other stock but horses previous to the shipment of plaintiff's cattle ; (b) that said car had ever hauled Texas or Southern cattle previous to that time; (c) that any cattle that had ever been hauled in said car had been diseased or in-

fected with Texas or Southern cattle fever, or any other disease ; (d) that defendant or its agents knew, or had ever known or suspected, or had had cause to suspect, or could by any kind of care have ascertained, that said car was infected with said disease. The testimony, being only circumstantial, is equally consistant with the idea that the disease was contracted at Searcy, in Jackson county, in Woodruff county, as well as upon the car. So the verdict must be wrong. 99 Mass. 605 ; Wills, Circ. Ev. p. 158 ; 50 N. W. Rep. 365.

2. *Scienter*, on part of the defendant, was neither alleged nor proved. 37 Kas. 133 ; 38 *Id.* 550 ; 80 Mo. 207 ; 35 Mo. App. 494 ; 37 *Id.* 593 ; 24 Mo. 199–202 ; 2 Robertson, 326 ; 45 Ill. 12 ; 2 Exch. Rep. 331–338.

3. This defendant is not liable upon a contract to which it was not a party nor privy. The car was not furnished by defendant, and no duty rested upon it to put said car in proper condition to haul stock. 37 Kas. 133 ; 38 *id.* 550 ; 8 Mo. 205.

4. The testimony of Flynn was inadmissible. The testimony of Hubbard was admissible.

*House & Cantrell* for appellees.

There are but two questions in this case. 1. Did the cattle contract the disease by reason of the condition of the car in which they were transported ? 2. If so, is the company liable ? The first question is settled by the verdict of the jury, and the finding is sustained by the evidence.

2. The defendant furnished the car and fixed the rate, and if it was the cause of the injury, it is responsible. Hutch on Car. sec. 150 ; 32 Ill. 116 ; 53 Ala. 19 ; 3 Duval (Ky.), 4 ; 48 N. H. 339 ; 17 N. Y. 306 ; 19 O. St. 221 ; 8 N. Y. 37 ; 112 Ill. 180. The defendant is liable whether it knew the car was infected or not. Hutch. on Carriers, sec. 222 ; 3 Metc. (Ky.), 51 ; 14 N. Y. 570 ; 24

Ia. 411 ; 46 Ark. 236.   See also 22 Wall. (U. S.) 123 ; 46
Ark. 236.   If a carrier furnishes cars unsuitable for the
use intended, even though they be cars for cattle which
the owner sees, etc., the carrier is not relieved, even
though there is an agreement that it shall not be re-
sponsible.   22 Wall. *supra.*

MANSFIELD. J.  1.  We have carefully examined
all the evidence contained in this record, and our conclu-
sion is that it admits of no theory on which we can hold
it sufficient to support the verdict.

1. When evidence insufficient.

The action was to recover damages alleged to have
resulted from the negligance of the defendant in furnish-
ing for the carriage of the plaintiffs' cattle a car infected
with the germs of Texas fever ; and, both by their
pleading and requests to charge, the plaintiffs assumed
the burden of proving facts from which the jury could
reasonably deduce the the following conclusions :   First,
that the car was infected ; second, that the defendant,
at the time of furnishing it, knew or by reasonable dili-
gence might have known its condition ; third, that the
cattle contracted the fever in the car.

It is not contended that the car could have been in-
fected otherwise than by hauling in it cattle capable of
communicating the disease ; and the only proof that cat-
tle of any kind had ever been in the car before it was
furnished to the plaintiffs consisted of the excrements
found on the floor.   These of themselves could only prove
that the car had been used in carrying cattle of some
kind and from some locality.   But, according to the un-
contradicted testimony of a veterinary surgeon given at
the trial, the infection could not be imparted except by
native southern cattle.   If, therefore, the stock leaving
the excrements were northern cattle, their carriage had
not the slightest tendency to prove the infection of the
car ; and as there was no evidence at all to show where
they came from, the condition of the floor of the car at

the time the plaintiff's cattle were shipped could as well
be attributed to the carriage of stock incapable of depos-
iting the germs of the fever as to the transportation of
those having that capacity.   The mere presence of the
excrements did not therefore justify either of the three
conclusions we have mentioned as necessary to warrant
a finding for the plaintiffs.   It is said, however, that the
cattle were not exposed to infection out of the car.   If
we concede this to be true, so far as the evidence dis-
closes, the fact standing alone would not warrant a find-
ing that the car was infected ; for it is entirely consist-
ent with the hypothesis that the disease was contracted
by some means that could not be ascertained from the
proof.   But there was evidence tending to show that the
cattle were exposed to infection outside of the car.   They
were shipped at Auvergne, in Jackson county, only nine
miles from Newport, at a time when the fever existed at
the latter town, and they were carried by Newport in
reaching Searcy in White county, the place to which they
were shipped.   It was further shown that White county
lies within the region permanently infected by the fever,
and that cattle brought there from Jackson and other
counties had died of a disease similar to that with which
the plaintiff's stock were affected.   As the latter reached
Searcy, and were taken from the car in less than twenty-
four hours after being shipped, there is nothing in the
time when the disease appeared among them to indicate
the place at which it was contracted ; and, leaving New-
port out of view as a possible source of infection, the evi-
dence adduced cannot be said to establish more than that
the fever was contracted either at Searcy or in the car
before reaching that place.   Conceding that such is the
effect of the proof, a rule laid down by the Supreme
Court of Massachusetts in *Smith* v. *Bank* is applicable
to the case.   It was there held that "when the evidence
tends equally to sustain either of two inconsistent prop-

ositions,   *   *   *   a verdict in favor of the party bound
to maintain" one of them "against the other is necessa-
rily wrong."   99 Mass. 605.   See also *Oliver* v. *State*, 34
Ark. 638.*

2. As the cause must be remanded for further
proceedings, it is necessary to notice some of the ques-
tions arising in the course of the trial.

In connection with other circumstances which were
in evidence, the record produced by the witness, Hubbard,
showing the movement of cars at Diaz station during
the year 1889, would have tended to prove that Missouri,
Pacific Car No. 6335, in which the plaintiffs' stock were
shipped, had not been recently used in the carriage of
other cattle.   The statement of Hubbard is not very
explicit; but we take it to mean that the entries in the
record are in the handwriting of Clayton, the absent
witness, and that they were made in the performance of
his duties as agent of the company.   If such was the
nature of the entries, and they were contemporaneous
with the facts recorded, and there was no reason to
question their fairness, we think they were admissible
on being properly authenticated.   Mr. Greenleaf places
the admissibility of such entries on the ground that they
are part of the *res gestae*, and he treats them as orig-
inal evidence which may be received independently of
the testimony of the person making them.   They must,
however, be authenticated by his oath if he is living and
his testimony can be procured.   If he is dead, or is out
of the jurisdiction of the court, or cannot be found, they
may be admitted on proof of his hand-writing.   1 Green-
leaf, Ev. secs. 115, 120; 1 Whart. Ev. secs. 238, 240,
250, 678, 683, 688; *Welsh* v. *Barrett*, 15 Mass. 380;
*Bartholomew* v. *Farwell*, 41 Conn. 107; *New Haven
etc. Co.* v. *Goodwin*, 42 Conn. 230; *Price* v. *Earl of
Torrington*, 1 Smith's Leading Cases, (8th ed.), 563, 575;

*margin note:* 2. As to admission of book entries.

---

* Compare *Cotton* v. *Wood*, 8 C. B. (N. S.), 568.

*Sneed* v. *State*, 47 Ark. 180 and cases cited. But it is
incumbent on the party offering entries of this kind,
unauthenticated by the oath of the person who made
them, to show, as a prerequisite to their admission,
that such person cannot be produced as a witness; and
when he is living, some discretion must be allowed to
the trial court in deciding whether proof offered as
preliminary to the. introduction of the entries is suf-
ficient to admit them as in case of the witness' death.
*Sneed* v. *State*, 47 Ark. 180, 185. The bill of exceptions
does not inform us that the statement made by defend-
ant's counsel as to their inability to secure the testimony
of Clayton was received as evidence; and if that state-
ment be disregarded, it does not appear that it was error
to exclude Clayton's entries, with no proof before the
court that he could not be found, except that Hubbard
swore that his place of residence was unknown, without
stating whether any effort had been made to ascertain it.

3. Admis-
sibility of
proof of rules
of railway.

3. J. T. Flynn, the superintendent of the Batesville
& Brinkley Railway Company, testified that he instructed
that company's agent at Newport to obtain a car from
the defendant company in which to ship the cattle; and
that the car in which the shipment was made was deliv-
ered to the former company at Newport and carried by
it to Auvergne where it was furnished to the shipper.
But he did not know what information was given to the
defendant in obtaining the order. He was then permit-
ted to state that, in making requisition for cars, his com-
pany was obliged to give its connecting carrier informa-
tion of the use to be made of the car and of the place it
was to be sent to. The admission of this statement was
objected to by the defendant. If, as we suppose from
the abstract, the witness was understood to refer to a
rule observed by the connecting carriers in obtaining
cars from each other, we think the statement was admis-
sible as a circumstance tending in some degree to show

that the defendant knew the purpose for which the car was required.

4.  It is assigned as error in the second and third instructions given to the jury on the plaintiffs' request that they make the defendant liable upon a contract to which it was not a party; and the same objection is made to the court's modification of the defendant's thirteenth instruction.    Although the defendant company was not a nominal party to the bill of lading, the contract of shipment contemplated its services in carrying the cattle the greater part of the distance from Auvergne to Searcy, and it not only furnished the car, but fixed the rate of compensation for the entire route.    The contract was as much for the defendant's benefit as for that of the Batesville & Brinkley road, and the plaintiffs could sue either of the carriers for a failure on its part to perform it.    If then the defendant was guilty of the negligence charged in the complaint, it cannot escape liability for the wrong on the ground that the bill of lading was not signed by its agent.    The instructions objected to were to this effect, and correctly presented the cause to the jury on the issues made by the pleadings.    *Halliday* v. *Railway Company*, 74 Mo. 159; 3 Am. & Eng. Enc. Law, p. 16*f* and note 9; *Wallingford* v. *Railway Co.* 2 S. E. Rep. 19; Hutchinson, Carriers, sec. 150; *Packard* v. *Taylor*, 35 Ark. 402.    It follows also that the thirteenth instruction of the defendant, in its original form, was properly refused.

5.  Our attention is also called to the phraseology employed by the court in modifying the 13th instruction. This, it is said, was such as to permit the jury to return a verdict on their mere belief, whether it was based on the evidence or not.    But the matter thus complained of was a mere verbal inaccuracy which would doubtless have been corrected on the suggestion of counsel.

*4.  Liability of railway for infected car.*

*5.  As to verbal inaccuracy in charge.*

27

The court erred in refusing to set aside the verdict on the ground we have indicated; and for this the judgment is reversed.