## LUMBERMEN'S INDEMNITY EXCHANGE et al. v. VIVIER. (No. 732.) *

(Court of Civil Appeals of Texas. Beaumont. Feb. 3, 1922. Appellee's Motion for Rehearing Granted March 8, 1922. Appellants' Rehearing Denied March 29, 1922.)

Master and servant ⬡405(4)—Evidence held insufficient to justify compensation for death of watchman assaulted.

In action to set aside award of Industrial Accident Board for death of night watchman employed by a lumber company, evidence *held* to show that the death resulted from an assault and robbery wholly disconnected from decedent's employment, so that claimant was not entitled to compensation under Workmen's Compensation Act, pt. 4, § 1, which, in subdivision 5(2) (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82), excludes recovery for injury by a third person, who intended to injure the employee for reasons personal to him, and not directed against him as an employee.

Walker, J., dissenting.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Suit by the Lumbermen's Indemnity Exchange and others against Mrs. Jules Vivier. Judgment for defendant, and plaintiffs appeal. Reversed and remanded.

C. A. Lord, of Beaumont, for appellants. J. W. O'Neal, of Port Arthur, and R. E. Masterson, of Beaumont, for appellee.

HIGHTOWER, C. J. The nature and result of this suit is clearly stated in appellants'·brief, as follows:

"The suit was brought by the appellants in the district court of Jefferson county, Tex., to set aside the award. made by the Industrial Accident Board, and it was alleged that, on the 27th day of September, 1919, one Jules Vivier, deceased, the then husband of the appellee, Mrs. Jules Vivier, was an employee of the George W. Smyth Lumber Company in Jefferson county, Tex., and that said company was the holder of a policy of insurance issued by the appellants for the payment of compensation under the terms and provisions of the Workmen's Compensation Laws of the state of Texas, as passed by the Legislature of 1913, and amended by the Act of 1917, and was a subscriber under the terms of the act and amendment; that on said date the deceased husband of the appellee was in the employ of the said company as a night watchman at its lumber yards or planing mills in Jefferson county, Tex., and that, while he was engaged in such employment, he was assaulted by unknown parties for the purpose of robbery, and his assailants had no other intention or purpose than to rob the deceased of money or other valuables upon his person, and that after he was assaulted he was robbed; then it was alleged that such assault and assassination did not arise out of any relationship of the deceased with his duties under his employment, and that he did not receive his injury and meet his death in defense of the property intrusted to him as such watchman, but that he was simply assaulted and robbed just as he might have been if he had not been such watchman, and that his assassination had no connection whatever with his work or his duties, so that his injury did not arise out of or in the course of his employment. It was alleged that nevertheless the appellee claimed that her husband was injured in the course of his employment, and that as such surviving widow she was entitled to receive compensation according to said compensation laws, and had made claim for such compensation, and the Industrial Accident Board had heard and considered the claim, and made an award allowing compensation, over the protest of appellants, who had always denied liability for the payment of compensation, and that the Industrial Accident Board had entered its award for compensation on the 17th day of January, 1920, whereby it was determined that the deceased was earning an average weekly wage of $19.25, and the Board awarded compensation in 60 per cent. of said amount, or $11.55 per week for a period of 360 weeks, beginning September 27, 1919, and to continue thereafter until the full amount should be satisfied. It was alleged that in due time appellants duly notified the appellee and the Industrial Accident Board that they were not willing and did not consent to abide by the final ruling and decision of the Board, and that they would institute suit to set aside the final ruling and decision of the court, and this suit was brought to set aside the award in due time and in due course.

"Appellee answered appellants' petition and filed a cross-action against appellants as the original plaintiffs, and asserted as the basis therefor the right to compensation accruing under the facts involved by the foregoing allegations.

"It was the contention of appellants upon the trial that there could be no recovery for compensation because, under all the facts and circumstances, it should be held that the injuries to deceased were not sustained in the course of his employment within the terms and pro-

visions of the Compensation Law as amended in 1917, but the trial court held that said injuries were received in the course of employment, and that the appellee would be entitled to recover compensation, and made its award accordingly, decreeing that the appellee was entitled to recover from the appellants on her cross-action, the sum of $11.55 per week for a period of 360 weeks, beginning September 27, 1919, and that appellee was entitled to recover at the date of the judgment for a period of 71 weeks, aggregating the sum of $820.05, with interest from the date of the judgment at 6 per cent. per annum, and that an additional amount should be paid by appellants from week to week."

From the judgment against them, appellants have duly prosecuted an appeal to this court.

We find in the brief of appellants two assignments of error, which are submitted together, as follows:

"The court erred in holding and finding that Mrs. Jules Vivier was entitled to recover on her cross-action compensation against said original plaintiffs as arising under the terms and provisions of the Workmen's Compensation Law of the State of Texas as amended by the act of the Legislature of 1917."

(2) "All of the facts and evidence show that the injury which Jules Vivier received was not sustained in the course of his employment as an employee of the Geo. W. Smyth Lumber Company, and that the injury so sustained by him and from which he died was caused by an act of a third person intended to injure the said Jules Vivier because of reasons personal to him, and not directed against him as an employee of the Geo. W. Smyth Lumber Company, or because of his employment by the Geo. W. Smyth Lumber Company, the subscriber in question, and the court erred in holding and finding that the injury from which Jules Vivier died was sustained in the course of his employment as an employee of the Geo. W. Smyth Lumber Company, and in rendering judgment for the compensation claimed on account of his death."

These assignments are submitted as a proposition within themselves.

A majority of this court, after full consideration, have reached the conclusion that the assignments must be sustained; Associate Justice WALKER dissenting. In view of the dissent, and to the end that there may be no misunderstanding or mistake about the evidence upon which the trial judge rendered his judgment, we have deemed it well to let this opinion show every word of the material testimony that was introduced below, and in doing so we could not shorten the opinion materially by making our own statement of the evidence, and will therefore let the opinion show it in full, as given by the witnesses themselves.

It was agreed by the parties below that the George W. Smyth Lumber Company was a subscriber under the Workmen's Compensation Laws of this state (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), and carried a policy with appellants, which was in force at the time of the injury to Jules Vivier, who was an employee of said lumber company. At the commencement of the trial below appellee assumed the burden resting upon her to show that she was entitled to compensation as prayed. The first witness introduced was F. E. Sager, manager for the George W. Smyth Lumber Company, whose testimony was as follows:

"Direct Examination.

"My name is F. E. Sager, and I am manager for the George W. Smyth Lumber Company in Beaumont, Tex. As manager of that company I have charge, or disposition, of hiring and firing the employees.

"On or about the 27th day of September, A. D. 1919, Mr. Jules Vivier was in the employ of the George W. Smyth Lumber Company; his position with that company on that date was that of night watchman in the sash and door department. I believe his wages were $19.20 or $19.25 a week as such employee. Our records show that he went to work for our company on the night of the 26th as night watchman; he came on to perform those duties about 6 o'clock, and his duties required him to stay there all night. As night watchman he was required to punch a watchman's clock; the stations were scattered all over the place. He was watchman over everything concerning the planing mill department. He had other duties besides punching the clock; he had to see that there was no trespassers in or around there, and he had to see that they did no damage to the property; he was there to protect the company's property. In addition to keeping a watch out for fire around the plant, he was there for the purpose of protecting the property of the George W. Smyth Lumber Company. It is alleged in that petition that he was injured about 6 o'clock on the morning of the 27th; I will state that that is about the date that he was injured. I did not examine the record of the clock to see what it showed regarding whether or not he had been punching the clock that night, but I understood the last punch was at 9:15. He was not found until the next morning about 6 o'clock. I did not see or examine Mr. Vivier after he was injured until I went down to the hospital to see him. I did not see him at the plant before they moved him; neither did I make a careful examination to see what I could find as to how he met with the accident; I made a casual examination or inspection. When I went down there I found the chair which is customary for the watchmen to sit in between the boilers in the boiler house; the chair was in the customary place, but of course, his body had been moved, and there was a electric light right up over the chair, and a Saturday Evening Post on the floor—of course there was blood stains there, and the light was still burning. He was sitting in the chair when he was found (I am told), and whoever struck him must have struck him from behind, because they couldn't get in hardly any other way to do it. There was nothing missing on the premises that belonged to the company—everything appeared to be in its usual order. There were

two entrances to the position where the chair faced, and he could see both ways unless they come in the window in the rear, but the window didn't show any evidence of any one coming in that way. It appeared that he had been struck with an iron bar. I understand that the iron bar had some blood stains on it. I did not inspect it, but I think the police department took that up. Mr. Vivier had been working for the company approximately two and one-half years; he had been night watchman during all of that time.

"I only know about Mr. Vivier's disposition around the place, and from which I have seen of his disposition around the place I would judge that he got along all right with his fellow men. All of the employees of the company seemed to like him very well; he always had a good word for everybody and he had a nice disposition. He had no known enemies that I know of; he did not have any around the place.

"About the time of Mr. Vivier's injury I did not hear of any trespassers or people being on the premises of the Smyth Lumber Company that did not belong there. The wharf and terminals run up and down by the plant, and there is more or less traveling up and down that track. Of course there is some people living in and around there, and their children used to steal a little wood now and then, but we didn't bother with them, because it was all right to let them steal a little wood now and then. Some time in the last three years there was some tramp put out of the shaving pile that wanted to sleep in there; I do not remember just exactly how long ago that was, but it was reported that they had to put a tramp out of the shaving pile that wanted to sleep there. If Mr. Vivier had found some one on the premises on a night that he was watching it would have been his duty to have run him off and phoned to the police department. There was sufficient lights operated around the plant at nights to show around, and the watchman carried a lantern. We kept a light on each floor of the plant, and sometimes there was one or two and one in the boiler house. Each building had one light on the floor, and the watchman carried a lantern in addition.

"Mr. Vivier had been paid off on the preceding day before he was injured that night; our records show that he received $19.25; that was for a week's wages. I do not know for sure whether he had any of the money on him when he was found injured; it is hearsay with me as to that. I understood, however, that the money was put in an envelope with the man's name and amount on it, and that the envelope was found in the neighborhood of where he was injured, and that there was only a few cents found in his pockets when he was found.

"Cross-Examination.

"I said that three years prior to Mr. Vivier's injury that there had been no trespassers and night marauders on the premises, with the exception of one time when is was reported that a tramp tried to sleep in the shaving pile. It is my recollection that Mr. Mabry received a report of that and it was mentioned to me in an off-handed way. A great deal that I have told is hearsay, and some of it I know of my own knowledge. I related the history of the affair as I understood it.

"I do not know what time the preceding day it was that he received his pay envelope. I do not know whether his pay envelope was handed to him at the office that night when he come on duty or not; it is my best impression that the pay envelope was left with some one at the plant, and they gave it to Mr. Vivier when he came on duty. The reason that I say that is because we shut down Saturday night, and if the watchmen don't come and get their pay it is usually given to one of the employees to hand to them. It is my understanding that Mr. Vivier signed the pay roll for the month. I think the pay roll was signed by him on Saturday afternoon, and the assassination took place some time during the night; it must have taken place shortly after the last punch of the clock, which was 9:15 in the evening.

"There was nothing molested or missing around the plant so far as anybody could tell. On the night that Mr. Vivier was injured he was sitting in his accustomed place in the boiler room reading a Saturday Evening Post, so far as we could tell. His body was found Sunday morning about 6 o'clock sitting in a chair. When he was found he was still living, but he was not conscious, and not able to speak; hence he did not make any statement as to how it happened or who assaulted him. The light was still burning the next morning when he was found. There was no other light in that same building; there was one light in the boiler room, the sash and door plant, and across the wharf and terminal tracks just a few feet away we had from one to two lights burning on each floor. There was no other watchman on in that plant with Mr. Vivier; Mr. Vivier took care of the sash and door department himself. There were other watchmen on the yard at different places, but none at that place with Mr. Vivier. The nearest station to the station that Mr. Vivier was injured in was approximately 250 feet away. I believe the nearest watchman to Mr. Vivier was A. L. Strode. Mr. Strode, is still with the company. He did not know anything about Mr. Vivier being injured until he come on duty, I believe, the next evening. He was on duty at the time Mr. Vivier was injured, but his territory is separate from Mr. Vivier's, and there was no occasion for one to step over into another's territory. Fred Ableton is the man that found Mr. Vivier's body the next morning; it was approximately 6 o'clock the next morning when he found him. He went there to go on duty—he was the day watchman. He was the man that relieved Mr. Vivier in the daytime. He was there to watch out for fires and report them, as well as other things. Everything indicated that Mr. Vivier was sitting in the chair at the time he was injured; when he was found there was a Saturday Evening Post by his side, and the lamp was still burning; his chair was under the lamp. He was unable to move at the time he was found, and he died a short time after he was removed to the hospital from his injury that he received there at the plant. I understand that he died shortly after he was taken to the hospital. I understand that he was struck on the head from the rear. Everything indicated that the money was removed from his pockets by the assailant."

Appellee's next witness, C. M. Sanders, testified as follows:

"I work for the undertaking company here in Beaumont. Our company was called upon some time in September, 1919, to go to the Smyth Lumber Company for the purpose of getting Mr. Jules Vivier, or a man that was injured in the planing mill department. I will go ahead and state what I found when I went down there—where I found Mr. Vivier and the conditions of things around there. We found the man sitting up in a chair with his head over this way. We raised him up; we didn't know at the time that he was not conscious, and we asked him if he could get on the ambulance cot and he couldn't speak, and we lifted him out of the chair on to the ambulance cot. Overhead there was a light burning, and by his side there was a book. We carried him to the hospital, and the doctor looked at him, and about 9 o'clock he died. When we went there after him we found a piece of iron laying near there; when I say near there, I mean close to where the man was sitting in the chair. I stated a while ago that when I went into the planing mill of the Smyth Lumber Company and saw Mr. Vivier that I believed that he was conscious, and that he was sitting up in the chair, and I spoke to him, and after speaking to him I found out that he was not conscious; he could not speak to me. He was sitting in a chair and the light overhead was burning.

"I examined Mr Vivier to see where he received that blow, but I did not examine him very closely, but it appeared that he was struck on the back part of the head. I did not notice to see whether there was anything to indicate that some one had robbed him of his money, but I don't think there was. His pockets were not turned wrong side out, indicating he had been robbed. I do not know who was with me at the time I made that trip down there— we have had two or three working for us since then—but I will say that there was some man from the establishment with me at the time I went down there after the man.

### "Cross-Examination.

"I did not find any money on his person when I took him to the hospital; I don't have anything to do with that—the Sisters at the hospital took charge of his effects, and I don't know whether they found any money on him or not. We don't have anything to do with that, they do that at the hospital.

"The light was still burning overhead when I went down there after him. When I found him he was sitting in a chair in the boiler room with his back to the boiler."

Appellee's next witness, Fred Ableton, testified as follows:

"My name is Fred Ableton, and I work for the Smyth Lumber Company. I was working for them on September 27, 1919, when Mr. Vivier was murdered. At that time they had me employed as day watchman, and in case the night watchman got sick or anything of that kind I filled his place. I was supposed to be a driver in the daytime when I was not watching. If the night watchman was sick, or got off, or anything, I filled his place. That morn-

239 S.W.—19

ing when I went to go on at 6 o'clock in the morning—I had to go through two doors before I got to him, and when I walked in he was sitting with his back around like this and his head leaning over this way—he was in a chair. The chair was fixed in a position so he couldn't fall out. I called him two or three times, and he didn't answer me; I run over to the other house, and called Mr. Mabry, and so the undertaker come and got him. I had to go in there and get the key—it was hanging by the door where he was setting. I did not make any investigation around there to try and find out how he received his injury; I was scared to go in there. I went in there with the undertaker— I helped put him on the cot. I did not notice to see whether or not his pockets were turned wrong side out like he had been robbed; neither did I investigate his person to see whether he had any money. His clock was hanging on a post; the post was right there, and the clock was hanging right by the side of him, and the key that belonged to the office, where I had to go and ring up, was hanging right there by him. I had to go back in there and get a key. I live right close to the planing mill; there is just a fence between my house and the sash and door department. I was at home that night —that is, the first part of the night—that Mr. Vivier was killed. I did not notice anybody fooling around the plant that night; I didn't notice any one at all. The first I knew about this injury was when I went to go on duty the next morning and found him.

### "Cross-Examination.

"He was struck with a piece of iron. The reason that I say that is because I seen the piece of iron. I can't tell you exactly what size piece of iron it was, nor what length, but it looked to be about that big around—about as big as a broom handle—and it looked to be about a foot and a half or two feet long. That piece of iron was laying off to his side. Whoever hit him must have come in from behind him, because he was sitting in between two boilers, and he could see all around him; they could have been in there—hid when he came in off of his round at 9:15. They could have been in there hid behind the boilers. There was a light over his head, and, of course, a man could have been hid behind the boilers, and after he set down in the chair a man could have run up there and hit him. I did not notice any tracks going in and coming out; I didn't look for any. It is evident that he was sitting in that chair when he was struck, and that he never did get up after he was hit; we taken him up. I could not tell you where that piece of iron come from. I have never seen that piece of iron around the plant before that. It was not used around there for a poker, or anything of that sort, that I know of. I suppose whoever hit him with that piece of iron must have picked it up around there, because they have all kinds of iron around there on the yard; the blacksmith and the forge use to use all kinds of iron fixing iron things. They have an iron scrap heap around there by the blacksmith shop.

"I did not look for his pay envelope laying around there when we found him; I did not see it laying around there. I knew the old man personally since he has been working for the Smyth Lumber Company, but I have been

knowing him a long time before that. He used to be a night watchman at the Mill in Orange, Tex. ·I do not know the name of the street that the old man lived on, but think it was Jerome street; it is in the south part of town. I don't know exactly how far his house was from the plant, but I think he lived in the 1300 block; I could not tell you exactly how far his house is from the plant. I suppose it is about a mile from the plant to his house.

"I never did notice any one around there visiting Mr. Vivier as a friend while he was on duty. I wouldn't have an opportunity of knowing anything about those things."

The appellee, Mrs. Jules Vivier, as a witness testified as follows:

"My name is Mrs. Jules Vivier, and I am the wife of Mr. Jules Vivier. At the time of Mr. Vivier's death I did not have any minor children; I am the only dependent that Mr. Vivier had at the time of his death. I have been married to Mr. Vivier 42 years. I am and was living at 1395 Jerome street at the time Mr. Vivier was killed.

"At the time Mr. Vivier was killed he was employed by the Smyth Lumber Company as night watchman here in Beaumont. On the 26th or 27th of September, 1919, Mr. Vivier left home to go to his work; when he left home it was 4:30. That is the last time I seen him alive. The next time I seen him he was killed. I saw him at the hospital the next morning about 8 o'clock; he was still living when I saw him, and he was still conscious; that is, I think he could remember things, but he couldn't speak. So far as I know he didn't speak after the time he was struck until he died. He had 35 cents on his person when he left home that evening; he did not have anything else in his pockets when he left, like a knife or keys. He carried that 35 cents in a little pouch. This is the same money he left home with that I have here in my hands, and this is the pouch that he had it in. I got this pouch and 35 cents at the hospital; this is all that they gave me.

"Mr. Vivier had been night watching for pretty near 13 years, I think. Before he came over to Beaumont he was night watchman at Orange.

"Mr. Vivier had a very nice disposition; he was very kind with every one, and never had a word with anybody, and he never disliked anybody. He would go direct from home to work and come right straight back. So far as I know he did not have an enemy in the world. I didn't know that he had a word with no one; he was pleasant with everybody. I do not know how he received the injury. It is my idea that they killed him to do robbery to the property. He never did tell me anything about anybody coming on the premises while he was night watchman; he never did tell me anything like that."

We do not here set out the evidence of the appellee on her cross-examination, for the reason that we deem it wholly immaterial, except as to a brief portion thereof, which appears on her recross-examination, and was as follows:

"I do not know what became of my husband's last pay envelope; I never seen it; I don't know if he was paid or not. If he was paid I never did get it. If he was paid off on the Saturday night before he was killed I didn't get the money. He was supposed to be paid off on that day, but I don't know whether he was paid off or not. Yes, sir; I understood that he was to get his pay on that day, but I don't know that he did. I never did inquire of the Smyth Lumber Company to see whether they had paid him off or not; I never did ask them about it. I don't know why I didn't go and ask them about it, it must have been because I was heartbroken and crazy. I couldn't talk with no one to save my life. I was heartbroken, and I didn't go to find out nothing. I knew that my husband was supposed to get his pay envelope that Saturday evening, and I needed the money, but I never did go there to see about it. I never did ask the Smyth Lumber Company whether they gave him his check that day or not; I did not ask them nothing about it. The reason that I didn't ask them about this money was because I didn't think about it; I didn't have sense enough to study about it."

She further testified, by way of conclusion, as follows:

"Whoever killed him didn't kill him for the money he had in his pockets."

The foregoing is every word of the material evidence that was adduced upon the trial below, and it is clear that the same is wholly without dispute or contradiction, and that there was no question of the credibility or veracity of the witnesses involved. A majority of the court have reached the conclusion, upon the undisputed evidence, that the injury which resulted in the death of Jules Vivier was not sustained in the course of his employment, under the provisions of the Workmen's Compensation Act of this state. See section 1, pt. 4, p. 292, Workmen's Compensation Act of Texas. In the act as amended in 1917 we find the following:

"The term 'injury sustained in the course of employment,' as used in this act, shall not include: '

"1. An injury caused by the act of God. * * *

"2. An injury caused by the act of a third person intended to injure the employé because of reasons personal to him and not directed against him as an employé, or because of his employment.

"3. An injury received while in a state of intoxication.

"4. An injury caused by the employé's willful intention and attempt to injure himself, or to unlawfully injure some other person, but shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employé engaged in or about the furtherance of the affairs or business of his employer, whether upon the master's premises or elsewhere."

We are of the opinion that the only reasonable conclusion or deduction that can be drawn from the undisputed evidence in this case is that the deceased met his death at the hands of an assailant whose motive was to rob the deceased of money on his person at the time, and that therefore such assault was prompted by a reason personal to deceased, and was not directed against him as an employee of the George W. Smyth Lumber Company in any respect, or because of such employment, and that, therefore, section 2 above quoted excludes the· injury which resulted in the death of the deceased as being one sustained in the course of his employment. So far as we have been able to discover, no appellate court in this state has had occasion to pass upon a case parallel in its facts to this, and we base our conclusion in this case upon our construction of section 2 above quoted as excluding the injury resulting in Jules Vivier's death as one sustained in the course of his employment at the time the injury was received.

Summing up briefly: The undisputed evidence shows that Jules Vivier, the deceased, received his pay check some time in the afternoon of Saturday, September 27, 1919. It further shows, without dispute, that the envelope in which this pay check was inclosed was found by his side next morning about 6 o'clock at the time his injury was discovered. It further shows, without dispute, that at the time of the assault deceased was sitting in a chair where he usually sat while on duty at night, and that he was struck by his assailant from behind. There is not the slightest suggestion in the evidence that the assailant came upon the premises for the purpose of trespassing, nor with the intention of molesting in any way the premises or any of the property of the George W. Smyth Lumber Company. On the contrary, the undisputed evidence, as we have detailed it, excludes any such surmise or suggestion. Not a thing on the premises had been molested. Not even the key to the office door, which was hanging on a post near the chair in which deceased was sitting, had been removed. There is not a scintilla of evidence suggesting that the assailant was detected by the deceased upon the premises, and that the deceased, in the performance of his duties, attempted to expel the assailant or to question his purpose there. There is not a thing in the whole evidence to suggest that any person had any grievance or ill will against the deceased because of his employment with the George W. Smyth Lumber Company; indeed, there is not a suggestion in the evidence that during all the time deceased had been employed by the lumber company he had incurred the ill will of any person because of his performance of his duties for that company. On the contrary, the

affirmative and undisputed evidence is that deceased was a man of lovable disposition, and had no enemies so far as known. The testimony further shows, without dispute, that there had been no trespassing upon the premises of the George W. Smyth Lumber Company for several years prior to the date deceased was assaulted, and that the last trespassing of any nature was by some little colored children some years before, which was really not objected to by the lumber company, as shown by the evidence of its manager. The conclusion is irresistible, from the undisputed evidence, that whoever assaulted the deceased on the night in question robbed him of his $19.25, which had been paid him on that afternoon as his week's wages, and, in our view of the law, if such was the only motive, prompting the assailant, the injuries received by deceased were not sustained in the course of his employment in contemplation of the Workmen's Compensation Act of this state, but were expressly excluded by section 2 above quoted. It has been said by every appellate court in this state that the Workmen's Compensation Act should receive a liberal construction in favor of the employee, and this court has, on several occasions, so declared; but by "liberal construction" is not meant that the very letter and spirit of any provision of the law, which is positive and clear in its meaning, should be disregarded in order to give compensation to an unfortunate employee or those dependent upon him.

It is unnecessary to carry this opinion at further length, because we think that the undisputed evidence, as we have shown it, demonstrates to a reasonable certainty that the deceased met his death at the hands of an assailant whose only motive was that of robbery of the deceased himself, and that, under the law as we have quoted it, such injury was for reasons personal to deceased, and in no manner related to him because of his employment by the George W. Smyth Lumber Company, and that the same in no manner grew out of his connection or employment with the Smyth Lumber Company, or because of any relation sustained by him to that company, and that the injury had nothing to do with and did not originate in the work, business, trade, or profession of the George W. Smyth Lumber Company.

It follows from these conclusions that the judgment of the trial court should be reversed, and judgment here rendered in favor of appellants; and such order has been accordingly made.

WALKER, J. (dissenting). My brethren have concluded that Vivier was murdered and robbed because of reasons personal to him, and not directed against him as an employee of the Smyth Lumber Company. Who murdered and robbed Vivier, and what

was the motive? My brethren exclude a motive of revenge, because they find:

"The affirmative and undisputed evidence is that deceased was a man of lovable disposition and had no enemies so far as known."

They say the motive was robbery—to rob Vivier of $19.25. Then the robber must have been a friendly fellow workman, because the evidence excludes the probability of any other person knowing that he had the money on his person. The money was paid to him by an agent of his employer on the evening before he was murdered. No stranger had an opportunity ·, know that he had it on his person. While he was in the employment of the Smyth Lumber Company, no one except his friends knew when and how he was paid his weekly wage; at least, no other inference .can be reasonably drawn from this record. Was the trial court required to find that a friendly fellow workman, actuated only by the motive of ill-gotten gain, murdered and robbed Jules Vivier for the paltry sum of $19.25? Such things have been done, but, on the facts of this record, such a conclusion is so improbable that the trial court, as a matter of law, was not compelled to adopt it. Hence I dissent from the conclusion reached by the majority.

My conclusion is that Vivier was murdered and robbed because he was an employee of, or because of his employment with, the George W. Smyth Lumber Company. In reaching this conclusion from the record, I recognize that appellee was under the burden of showing that her claim for compensation was 'not excluded by the second section of the article of the Workmen's Compensation Act, as quoted in the majority opinion. As there was no conflict in the testimony, I also recognize that she must meet the requirements of the rule well stated by Mr. Justice Carter in Ohio Building & Safety Vault Co. v. Industrial Board, 277 Ill. 96, 115 N. E. 149:

"It cannot be said that the existence of a certain fact may reasonably be inferred from the evidence when the existence of another fact inconsistent with the first can be from the same evidence inferred with equal certainty. [I would cite Railway Co. v. Carter, 166 S. W. 115; Carlton v. Cooper, 160 S. W. 597; Smith v. Bank, 99 Mass. 605; Railway v. Henderson (Ark.) 21 S. W. 878.] A theory cannot be said to be established by circumstantial evidence unless the facts relied on are of such a nature and are so related to each other that it is the only conclusion that can reasonably be drawn from them. Condon v. Schoenfeld, 214 Ill. 226, 73 N. E. 333; Neal v. Chicago, Rock Island & Pacific Ry. Co., 129 Iowa, 5, 105 N. W. 197, 2 L. R. A. (N. S.) 905. But the proof of such facts may be made by circumstantial as well as by direct evidence. A greater or less probability leading, on the whole, to a satisfactory conclusion, ·is all that can reasonably be required to establish con-

troverted facts. Devine v. Delano, 272 Ill. 166, 111 N. E. 742; Hills v. Blair, supra."

See, also, Smith v. Heitman, 44 Tex. Civ. App. 358, 98 S. W. 1074; Spoon v. Sheldon, 27 Cal. App. 765, 151 Pac. 150; Ferrell v. Beaumont Traction Co. (Tex. Com. App.) 235 S. W. 531.

Measured by the test that "a greater or less probability, leading, on the whole, to a satisfactory conclusion, is all that can reasonably be required to establish controverted facts," I submit that a careful examination of the testimony shows that appellee has made out her case. If she has, this court is without authority to disturb the judgment rendered in her favor.

Vivier was employed as a night watchman. His duty was to guard the premises against trespassers, tramps, thieves, thugs, and night prowlers. · The premises were open and exposed to such persons. I say this because the evidence shows that at one time a tramp was caught in a shaving pile on the premises, and children in the neighborhood were charged with stealing wood from the premises. As to the duties of Vivier, Mr. Sager, the manager, testified:

"He was watchman over everything concerning the planing mill department. He had other duties besides punching the clock; he had to see that there was no trespassers in or around there, and he had to see that they did no damage to the property; he was there to protect the company's property. In addition to keeping a watch out for fire around the plant, he was there for the purpose of protecting the property of the George W. Smyth Lumber Company."

The current history of to-day, as told by the newspapers, is replete with tragedies similar to this—faithful night watchmen killed by night prowlers on the chance of getting whatever is convenient at hand. The facts marshaled by the majority in support of their conclusion tend with more potency, it seems to me, to support the conclusion I have reached. It is scarcely possible that a night prowler would have undertaken to pilfer from the premises without locating the watchman. When found, he was an easy prey to a murderous assault. Having both killed and robbed, the assailant hastily left the premises. This conclusion seems to me to be logical—in fact, the only reasonable conclusion to be drawn from the undisputed facts. But my brethren say:

"There is not the slightest suggestion in the evidence that the assailant came upon the premises for the purpose of trespassing, nor with the intention of molesting in any way the premises or any of the property of the George W. Smyth Lumber Company. On the contrary, the undisputed evidence, as we have detailed it, excludes any such surmise or suggestion. Not a thing on the premises had been molested. Not even the key to the office door, which was hanging on a post near the chair in which de-

ceased was sitting, had been removed. ·There isn't a scintilla of evidence suggesting that the assailant was detected by the deceased upon the premises, and that the deceased, in the performance of his duties, attempted to expel the assailant or to question his purpose there."

"Not even the key to the office door, which was hanging on a post near the chair in which deceased was sitting, had been removed." Must the conclusion follow that the assailant saw the key, or knew of its existence? If the key has any weight in the case, should not it be inferred, with more probability, that the assailant searched Vivier for the key, found the pay envelope, and was satisfied with the night's work. "Not a thing on the premises had been molested." This was a lumber yard. Except for the things in the office (and it was locked) it does not appear that there was anything on the premises that the assailant could have stolen. He could have wantonly destroyed the property. He could have broken into the office. But this would have tended to give warning of his presence. He had committed murder and robbery, and every instinct of self-preservation warned him to leave as silently as he had entered, with the least possible trace of his presence. I concur with my brethren that there is no suggestion that Vivier detected the assailant on the premises, nor that he attempted to expel him. I think the record shows conclusively that Vivier never knew of his presence. But this circumstance is without probative force on either inference. If the assault was prompted by a motive to rob Vivier of $19.25, or if it was committed by one entering for the purpose of pilfering the premises, doubtless the assailant would have approached Vivier with all possible caution.

I believe the evidence fully supports the conclusion that Vivier was assaulted by a night prowler, who entered the premises with no motive directed against him personally, but for the purpose of pilfering the premises, and having found Vivier on the premises, assaulted and robbed him as an incident of his unlawful entry.

This conclusion calls for a discussion of the section of the article of the Workmen's Compensation Act quoted by my brethren, and on which they base their opinion. Under this section, if the assailant entered the premises with the formed design of robbing Vivier, appellee has no cause of action. Walther v. American Paper Co., 89 N. J. Law, 732, 99 Atl. 263. But, if he entered the premises for an unlawful purpose, without reference to Vivier personally, then he was injured "because of his employment," and his death does not come within the provisions of section 2. Hellman v. Sand Paper Co., 176 App. Div. 127, 162 N. Y. Supp. 335. In other words, if Vivier was assaulted because he was the night watchman, and not because he was Vivier, then this judgment should be affirmed, for his employment subjected him to just the risk that resulted in his death. As I think such an inference can and should be drawn from the testimony in this case, and as the trial court so found, I think his judgment should be affirmed.

I heartily concur in the following proposition announced by my brethren on the proper construction of the Workmen's Compensation Act:

"It has been said by every appellate court in this state that the Workmen's Compensation Act should receive a liberal construction in favor of the employee and this court has, on several occasions, so declared; but by 'liberal construction' is not meant that the very letter and spirit of any provision of the law, which is positive and clear in its meaning, should be disregarded in order to give compensation to an unfortunate employee or those dependent upon him."

But I do not understand that a "strict" or "liberal construction" of the act has anything to do with the issue involved ·in this case. The law, under the aforesaid section 2, imposed a certain burden on appellee. She can only meet that burden, as I understand, by complying with the conditions of the rule I have quoted. This rule seems to be recognized in all cases where the evidence is undisputed. As the burden rested on her, under this general rule the judgment should be affirmed if she has reasonably met its terms. If she has not, then her case must fall, on the ground that she has failed to discharge the burden imposed upon her by law.

On the facts of this case, I believe my conclusion is supported by the great weight of authority. In the following cases, and in the cases reviewed by them, facts similar to the facts of this case are discussed: Ohio Building & Safety Vault Co. v. Industrial Board, supra (almost on "all fours"); Chicago Dry Kiln Co. v. Industrial Board et al., 276 Ill. 556, 114 N. E. 1009, Ann. Cas. 1918B, 645; Polar Ice & Fuel Co. v. Mulray, 67 Ind. App. 270, 119 N. E. 149. I would specially call attention to the second syllabus of the last-cited case:

"Although the inference,· that servant's death arose out of his employment is not the only one that might be drawn from the evidence, yet, being a reasonable conclusion, such finding by the Industrial Board must be upheld."

The majority closed their statement of the case with the following statement by appellee:

"Whoever killed him [referring to Jules Vivier] did not kill him for the money he had in his pocket."

The statement of facts reflects that learned counsel for appellant replied to this statement by appellee by saying:

"Yes; I agree with you on that."

And I would close this opinion by saying that I heartily concur with counsel in the conclusion thus expressed by him.

## On Rehearing.

HIGHTOWER, C. J. We have carefully considered appellee's motion for rehearing in this cause, but are still of the opinion, for the reasons stated, in the former opinion, that the evidence adduced on the trial as shown by the present record was insufficient to sustain the trial court's judgment in favor of appellee. We are now of the opinion, however, that we ought not to have rendered judgment in favor of appellant, but should have reversed the trial court's judgment, and remanded the cause. It follows that appellee's motion for rehearing, in so far as it complains of our rendition of judgment in favor of appellant, should be granted; and it is so ordered. It is now ordered by this court that the trial court's judgment be reversed, and that the cause be remanded.

---

⊚⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

