(No. 21706.—)

THE LIQUID CARBONIC COMPANY, Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(JESSIE SAVAGE, Plaintiff in Error.)

*Opinion filed April 22, 1933—Rehearing denied June 9, 1933.*

FRANK A. McCARTHY, and DANIEL L. MADDEN, (JOHN E. TOOMEY, of counsel,) for plaintiff in error.

ANGERSTEIN, PIGGOTT & ANGERSTEIN, (THOMAS C. ANGERSTEIN, and CLARENCE S. PIGGOTT, of counsel,) for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

This writ of error was awarded to review a judgment of the circuit court of Cook county which set aside an award of the Industrial Commission against the Liquid Carbonic Company in favor of the plaintiff in error, Jessie Savage, as compensation for the death of her husband, alleged to have been caused as the result of an accidental injury arising out of and in the course of his employment. Whether his death was so caused is the question in the case.

James Savage was fifty years old and apparently in good health, was never ill and never saw a doctor. He had been working for the defendant in error, the Liquid Carbonic Company, since January 11, 1927, as a coal passer and shoveler, working ten hours a day. For eight or ten years before that time he worked for the Barrett Manufacturing Company firing the boilers. The occurrence of the accident which is the basis of the claim was testified to by a fellow-workman, Angelo Disonto. He said that while

they were shoveling a car-load of coal Savage got one foot in a hole and fell down. Disonto helped him to get up and helped him go to the boiler room. He was lame and limping. He remained in the boiler room the rest of the day. Disonto worked all day shoveling coal. He saw Savage at noon in the boiler room, and Savage left to go home in the evening at the same time as Disonto. When he reached his home, Mrs. Savage testified, he sat in a chair while she prepared his supper and afterward helped him undress and into bed. She found his knee bandaged, and after removing the bandage rubbed the parts around the knee with Sloan's liniment. There is an irreconcilable conflict in the evidence in regard to subsequent events and changes in Savage's condition until his death, which occurred on February 6. Mrs. Savage did not see him after his going to bed on January 26 until the next morning, when she called him to get ready to go to work. He was unable to get out of bed after making several efforts. She called the company and told them he would not be down to work and was told they would send a doctor.

Mrs. Savage testified before the arbitrator that on January 27 the knee was swollen to more than twice its normal size and was discolored. On the fourth day after the accident, in the morning the leg appeared to be normal but by evening it was again swollen. On the fifth day the swelling of the knee had diminished somewhat but had gone down into the calf of the leg. On the fifth day Dr. Miller, who was the physician sent by the company, said he thought Savage could sit up, and he was brought to the dining room and laid on a couch. When he let the leg down it would swell but when he held it up it was all right. He was able to get around with the aid of a crutch or with the aid of Mrs. Savage's father, who lived there. He was in good health and felt fine except for the pain in his leg. He was unable to eat and complained of his leg. Mrs. Savage bathed his head with water. She and her father helped

him get out of bed, and that condition continued for six days. During all this time his knee and leg were badly swollen and discolored. On the sixth his leg appeared the same as the day before, but Mrs. Savage thought he had a fever. About half an hour before he died the swelling had left the knee but had gone into the calf, which was then very much swollen and badly discolored—purple, "blue-reddish." Until the noon meal of that day he had been eating broth, soup and food of that kind, but on that day he sat at the table with the family and ate breaded pork chops, mashed potatoes and lettuce, and after dinner he went from the table to the bath-room to take a bath. A few moments later he made noises as if he were vomiting. Mrs. Savage and her father ran to the bath-room and found him undressed and fallen down over the bath tub, into which water was running. He was put in bed and died a few moments later, before the doctor arrived. Mrs. Savage testified further that most of the time while he was confined to the house his body was very warm, and that it was feverish, in fact. She further testified that Dr. Miller, the company physician, who called on him three times during the period, never took his temperature, never put his finger on him and did not touch his leg or skin; that the last day or two Savage could not move around without help, and that they helped him into the bath-room and left him there. When they returned to him he was undressed.

George Monroe, father of Mrs. Savage, testified that the leg was swollen on January 26; that "the first day after that it got worse and more swollen down in the leg. The swelling at the knee did not go down much. It stayed about the same all the time. There was considerable swelling in the knee the day he died. * * * He was feeling a little better, he said, and could use his leg a bit more. The day he died his leg was swelling down below the knee, but I couldn't tell how much because I did not measure it. I had Sunday dinner with him and he had a good meal, as

he usually does. His appetite was good all the other days he was sick."

Dr. Miller testified that he first called on Savage on the twenty-seventh. He found an enlarged, swollen knee, and recommended hot applications, rest and elevation. He called again (testifying from his record) and found Savage apparently resting comfortably and the treatment was continued. He called again on the thirty-first, and at that time the swelling had subsided. Savage had his trousers on and was up and around the house. He called on February 6 and found Savage up, going around without the use of a cane. The knee was normal in appearance—no evidence of swelling. He instructed Savage to come to his office the following Monday. When he examined Savage he looked the knee over, touched the body, and at no time noticed any elevation or a fever of the body tissues, and he did not think Savage had a fever.

A post-mortem examination was made by Dr. Henry G. W. Reinhardt, who had had much experience in that work as coroner's physician. His examination disclosed a slight swelling at the knee joint but no discoloration and no swelling in the calf of the leg. He opened up the skin and soft parts and found an increase of fluid in the surrounding tissue. There were no clots of blood or thrombi in the veins or arteries. The lungs were bound down by old pleuritic adhesions; the heart was dilated; the cavities were filled with fluid and clotted blood; there was a musuclar degeneration of the heart muscles; the liver was also bound down to the diaphragm by the old adhesions and the surface was torn by removing the liver; the spleen likewise was bound down and lost its covering by being removed; the stomach was full of fluid and partly digested foodstuff which had been recently introduced; the kidneys were practically normal, except there was an increase of fat in the center; the clots of blood were in all the heart cavities. The doctor reported at the coroner's inquest that the cause

of death was chronic myocarditis, with acute dilatation—that is, the heart was in diastole. It had expanded to receive the blood and had not again contracted to send the blood out into the body and was thereby left dilated. The myocarditis, or degeneration of the muscles, was chronic; the acute dilatation was not. There was nothing of what is known as enlargement of the heart.

Dr. Reinhardt was called by the plaintiff in error and testified in chief as to the conditions he found upon his examination of the body and his report at the inquest of the cause of death. He was not asked by the plaintiff in error what the cause of death was. Upon his cross-examination he was asked by the attorney for the defendant in error his opinion as to the cause of death, and, upon hypothetical questions, as to whether the injury to the leg had any causal relation to the death. The objection that it was not proper cross-examination was overruled, and the plaintiff in error contends that this action of the arbitrator was error.

Section 16 of the Workmen's Compensation act provides: "The board may make rules and orders for carrying out the duties imposed upon it by law, which rules and orders shall be deemed *prima facie* reasonable and valid; and the process and procedure before the board shall be as simple and summary as reasonably may be." The object of the act is the allowance of compensation for accidental injuries to employees as promptly and cheaply as may be. The Industrial Commission, it has frequently been said, is not a court and the process of investigating claims and awarding compensation is not a trial at law. Failure to observe the formal, technical rules of procedure or evidence which apply to trials in court is not fatal to an award which is just upon the merits. This statement does not extend to a disregard of substantive law or positive provisions of the act. Since the commission is not a court the rules of common law pleading have no appli-

cation to its proceedings. These proceedings are such as are authorized by statute, and by section 16 of the act the commission is authorized to make rules and orders for carrying out the duties imposed upon it by law. At the end of paragraph (e) of section 19 of the act appears the statement: "The applications for adjustment of claim and other documents in the nature of pleadings filed by either party together with the decisions of the arbitrator and of the Industrial Commission and the statement of facts or transcript of evidence hereinbefore provided for in paragraphs (b) and (c) shall be the record of the proceedings of said commission, and shall be subject to review as hereinafter provided." This is the only statement in the act in regard to the manner in which the claim for compensation shall be presented. It is held that the burden of proof is always on the applicant for compensation to prove by legally competent evidence the facts which establish his claim, and the proof, whether by direct and positive or circumstantial evidence, must be such as by its preponderance justifies an inference of liability without the necessity of a resort to speculation, conjecture or surmise or a choice between two views equally compatible with the evidence. (*Ohio Building Vault Co.* v. *Industrial Board,* 277 Ill. 96; *Goelitz Co.* v. *Industrial Board,* 278 id. 164; *Savoy Hotel Co.* v. *Industrial Board,* 279 id. 329; *Peterson & Co.* v. *Industrial Board,* 281 id. 326; *Jersey Ice Cream Co.* v. *Industrial Com.* 309 id. 187.) While, clearly, the decision of the arbitrator or the commission must be governed by evidence legally competent, a disregard of the technical rules in regard to the method of production and hearing of evidence and the examination of witnesses in a common law trial will not be sufficient to set aside an award which is sustained by competent evidence. In this case, granting that the questions asked were not proper cross-examination and that an objection might have been sustained to them in a common law trial, the evidence elicited by them was

legitimate evidence, which the defendant in error was entitled to submit. Whether the evidence was given in answer to questions by the one party or the other was immaterial. The attorney for the plaintiff in error, in stating his objection, said that he called this man as a special witness—an official witness—and now the other side was calling him as an expert witness, asking him if he has an opinion, concluding, "Certainly they can't do that in cross-examination." After some remarks by the arbitrator to the effect that she did not see counsel's distinction, counsel continued: "He may ask but he must make him his own witness; they can't bind us by this witness by going outside the line of the direct examination." The motion being overruled, counsel for the defendant in error continued his examination of the witness as to his opinion as to the cause of death and asked several hypothetical questions. The order in which this testimony was produced was entirely immaterial. Of course, it was not binding or conclusive on either party, as the arbitrator showed, by what she said, that she very well understood. The counsel for the plaintiff in error was not deprived of his opportunity to cross-examine the witness on the new matter developed in his cross-examination by the counsel for the defendant in error, and when Dr. Miller left the stand the case was in the same condition as it would have been if the arbitrator had sustained the objection of the plaintiff in error to the cross-examination by the counsel for the defendant in error and the latter had then called Dr. Reinhardt as his witness and asked him the same questions he did actually ask during the cross-examination. If this action of the arbitrator was erroneous it certainly did no harm to anyone.

Counsel argue now that the plaintiff in error called Dr. Reinhardt for the specific purpose of showing that he made the examination of the body and the report he made to the coroner, and did not qualify him as an expert or

vouch for either his veracity or his professional knowledge, and they should not be bound by his answers on cross-examination. This may all be true, and they are not, and cannot be, bound by what was brought out on cross-examination, but no objection was made to his qualification as an expert. It cannot be made now, for if it had been made the defendant in error would have had an opportunity to show his qualification. The doctor's opinion, based on his examination of the body, was that the acute dilatation of the heart was caused by the chronic myocarditis. Upon re-direct examination he testified that fever results in quickening the heart action, a more rapid expansion of the heart, greater tension on the muscle fibres and greater labor on the circulation in general to compensate for the extra heat, and that fever, where a myocarditic heart has chronically existed, might operate as the last straw. Upon re-cross-examination he testified that the eating of a hearty meal puts extra work and shock upon the heart also; that death from such a heart condition frequently comes after a hearty meal; and in answer to a hypothetical question embodying the facts as hypotheses, the doctor was of the opinion that there was no causal relation between the injury to the knee and the death.

Dr. Orlando F. Scott, called by the plaintiff in error before the arbitrator, in response to a hypothetical question stated that in his opinion there might or could have been a direct causal relationship between the injury and the conditions found on the post-mortem examination, basing his opinion largely on the belief that the injury produced a fever, and that the additional work thrown on the chronic myocarditic heart was sufficient to produce a cessation of the heart activity and death.

Dr. H. I. Smith, called by the defendant in error, testified, in answer to a hypothetical question, that there was nothing described in the hypothetical question relative to the knee that would have contributed to the cause of death,

because the swelling of the knee had subsided and the post-mortem examination showed no thrombi or embolism. On cross-examination he stated that fever increases the heart action.

Before the commission the evidence was supplemented by Drs. Louis K. Eastman and Bernard Conway for the plaintiff in error, and by Dr. William J. Swift for the defendant in error, testifying as experts in answer to hypothetical questions. Dr. Eastman was of the opinion "that the injury received eleven days previous was the definite cause of the heart condition, due to the fact that the man had previously not been ill, he had been working steadily, and that he had apparently an infection or injury that involved a number of the large blood vessels and the soft tissues around a joint, the circulation being affected or impaired at the time, which would cause absorption, causing the temperature to be elevated, causing the heart to be overworked; that the heart, as the coroner's physician stated, had a chronic myocarditis. These would be aggravating factors, and aggravating to a point—over a period of eleven days—it would accelerate the heart to a point where the muscle was overworked, and it might cause complete fatigue and death." He further stated: "In this hypothetical individual it was definitely described there was swelling—all the definite signs of inflammation. An inflammatory process of this kind around a great joint would cause an increase of temperature, would cause an increase in the heart rate, increase the activity of the heart, and the strength of the muscle of the heart would be overtaxed. * * * In the hypothetical question here I would attribute as to the cause a definite inflammatory process."

Dr. Conway was also of the opinion that there was a direct causal relation between the injury sustained eleven days previous and the condition found at the post-mortem, or the cause of death, because, "first, the fact that the man was injured and had a discolored leg, evidently there was

some hemorrhage into the tissues. If there was a hemorrhage into the tissues at the time of his injury certainly there was some blood-clot formation eleven days after. If on post-mortem examination the heart was opened up and fresh blood clots found, it is quite possible that the blood clot was picked up at the time of the injury, or even eleven days after, and carried to the heart, and evidently this was acute dilatation, because probably the fresh blood clots found in the heart were formed from a small clot picked up from the site of the injury, causing the acute dilatation of the heart. * * * As for the coroner's finding that there were no clots of blood or thrombi in the veins or arteries does not dispose of the idea that there were clots there a few seconds before death, because they may have been carried there by one of the blood vessels before his death. It may have been the last blood clot in his leg and the blood squeezed through, because there was a discoloration at the time of his death. There was one between the time he was hurt and the time he died, as I understand it. It is very likely that the man had some clots and they all absorbed except one the size of a pin-point, and that broke off before his death so there was nothing found at the time of his death. That could happen. It could be the first or the last. Yes, I do understand there were clots on the left side of the heart as well as the right. As for clots on the left side being caused by the tiny clot coming up from the leg, that was caused by the acute dilatation of the heart. I certainly do think that the tiny piece the size of a pin-point was there but probably not noticed." He further testified that eating a meal, or fever, or exertion of any kind, will throw an additional burden on the heart. His testimony assumed that there was a fever, resulting from the injury to the knee. As there was no evidence that the death was caused by embolism or thrombus, the testimony of Dr. Conway was of no value, for his opinion was that an embolism or thrombus was the cause of the

failure of the heart, except to the extent that it showed that fever or eating a meal increases the heart action.

Dr. Swift was of the opinion that the injury to the knee had no causal relation to the death.

The testimony of the medical experts was in substantial agreement that where chronic myocarditis exists any unusual strain on the heart may cause it to cease functioning; also, that it is frequently the case that such a heart will stop where the person is at rest in bed or sitting quietly in a chair. Any exertion increases the heart action. Many times death occurs shortly after a meal. The post-mortem examination eliminated the probability of death by embolism. The medical testimony for the plaintiff in error, except Dr. Conway's, was based on the supposition that Savage had a fever, and that, consequently, a heavier burden was thrown upon his heart, resulting in its being taxed beyond its strength in its diseased condition. There was no evidence upon which to base the supposition that Savage had a fever. Mrs. Savage thought his skin felt warm, but Dr. Miller thought there was no evidence of fever. There was only a guess. Therefore the medical testimony based upon the hypothesis that fever existed had no value, and there was no evidence to show a causal relation between the injury and the death. The decision of the Industrial Commission being without foundation in the evidence, the circuit court properly set it aside. *Nelson* v. *Industrial Com.* 346 Ill. 82.

It is suggested that in any event there should have been an award of compensation for the period of eleven days during which Savage was totally incapacitated for work. Such an award of compensation could be made only in favor of an administrator, and the petition here was by the widow.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*